**CITIBANK, N.A., Plaintiff,**

v.

**NYLAND (CF8) LTD., New York Land Company, et al., Defendants.**

No. 86 Civ. 9181 (WK).

United States District Court,
S.D. New York.

July 28, 1987.

Robert Abrahams, Schulte Roth & Zabel, New York City, for plaintiff.

Robert Smith, Paul, Weiss, Rifkind, Wharton & Garrison, Andrew J. Levander, Shereff, Friedman, Hoffman & Goodman, New York City, for defendant Nyland (CF8) Ltd.

Michael J. Silverberg, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant New York Land Co.

Jeffrey J. Greenbaum, Sills Beck Cummis Zuckerman Radin & Tischman, New York City, for defendant Republic of Philippines.

Charles C. Parlin, Shearman & Sterling, New York City, for Cushman & Wakefield, Receiver.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

In a companion action pending in this District, *Republic of the Philippines v. Marcos*, 86 Civ. 2294 (PNL) ("*Philippines* action"), the Republic of the Philippines ("Philippines") alleges, *inter alia*, that Nyland (CF8) Ltd., the New York Land Company, and others purchased real property in New York, including 40 Wall Street, with monies unlawfully purloined from the Philippines by former President Ferdinand Marcos, and therefore hold those premises in a constructive trust for the Philippines.[1]

In this action Citibank seeks to foreclose on a mortgage on one of the above described premises, 40 Wall Street. It now moves for partial summary judgment against the following defendants: Nyland (CF8) Ltd. as represented by Paul Weiss ("Nyland (PW)"), Nyland (CF8) Ltd. as represented by Shereff Friedman ("Nyland (SF)") and the New York Land Company ("New York Land"), which defendants vigorously oppose the motion.[2]

Two and a half million dollars in monetary defaults on the mortgage have been alleged by Citibank and not contested by defendants. We therefore need not dwell on the existence or sufficiency of these numerous defaults, and move instead to consider the validity of the various affirmative defenses and counterclaims raised by these defendants.

## 1. Lack of Consideration

■ The first affirmative defense raised by Nyland accepts the allegations in the *Philippine* action as true and asserts that Citibank was aware that the funds it pro-vided under this mortgage were diverted to Marcos (or his surrogates), rendering the mortgage invalid for lack of consideration. Even if we assume the truth of these allegations, they might support the Philippines' case, but they can not be asserted as a defense to foreclosure by other defendants who, it is claimed, participated in the diversions.[3]

## 2. Waiver and Estoppel

■ The next two affirmative defenses, the so-called *Nassau Trust* defenses, *see Nassau Trust Company v. Montrose Concrete Products Corp.* (1982) 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E.2d 1265, based on waiver and estoppel, can be treated simultaneously.

Nyland's President Joseph Bernstein in an affidavit asserts that officers of Citibank orally promised him that Citibank would not foreclose on the mortgage without giving Nyland the opportunity to arrange to cure its defaults. Notwithstanding the provision in the mortgage agreement which specifically disavows such oral waivers and the numerous letters from Citibank to Nyland during the relevant time period informing it of the defaults and asserting that nothing was being waived, Nyland claims that under *Nassau Trust*, Bernstein's sworn assertion that an oral waiver was made is sufficient to raise a triable question of fact as to waiver and thereby defeat summary judgment.

We shall assume the validity of that portion of the *Nassau Trust* defense which permits an assertion of oral waiver to defeat summary judgment, and go on to consider whether—assuming that Citibank had given defendants additional time prior to instituting this foreclosure action—there is any possibility that defendants could have cured their defaults. Under *Nassau Trust*, summary judgment is still appropriate

---

1. *See Republic of the Philippines v. Marcos* (2d Cir.1986) 806 F.2d 344.

2. A motion is pending in the *Philippines* action to determine which warring faction of Nyland is authorized to speak for the company. In the meantime, two law firms appear on Nyland's behalf, each purporting to represent it. As far

as resolution of this motion is concerned, however, their positions are not inconsistent.

3. In the *Philippines* action these defendants deny having participated in these diversions. For purposes of pleading this affirmative defense, they concede such participation.

where the moving party can demonstrate that "the giving of notice would 'have been but an idle ceremony, and could not have changed the situation.'" *Nassau Trust,* 56 N.Y.2d at 186, 451 N.Y.S.2d at 669, 436 N.E.2d at 1271, quoting *Toplitz v. Bauer* (1900) 161 N.Y. 325, 335, 55 N.E. 1059. Since defendants' own assertions in the course of this litigation have conclusively established that no possibility for settlement existed, the *Nassau Trust* defense must fail.

In their papers and again during oral argument Nyland and New York Land asserted that once the *Philippines* action was commenced, all sources of funding evaporated, making it impossible for them to meet current operating costs, let alone locate funding to cure existing mortgage defaults. *See e.g.* Affidavit of Joseph Bernstein in opposition to this motion at ¶ 10 ("Nyland could not secure financing for the ongoing development and administration of 40 Wall Street"); Affidavit of Morad Tahbaz, Vice President of New York Land, dated December 12, 1986, ¶ 3 ("As a result of the Court's [Judge Leval's] injunction, it has been impossible for [New York Land] or Nyland to utilize the substantial equity value of the building to obtain the additional financing needed to meet shortfall and cover all expenses, interest and taxes"); New York Land's Memorandum of Law dated June 3, 1987, in Opposition to this motion ("When the Philippines litigation was commenced, all infusions of capital ceased"). Further, most of the essential parties to the alleged settlement agreement which was being pursued, certainly Citibank and Mr. Petersen of Nyland (SF), were not in favor of its consumation. *See* Transcript of June 24, 1987 (Mr. Smith for Nyland (PW): "I don't deny Mr. Peterson's intransigence had something to do with it. There is plenty of blame to go around.")

Citibank, the most important party in any attempts to settle, had good reason not to be in favor of the settlement proposal. It expressly required Citibank to continue funding the property for 8 additional months at a cost to Citibank of six million dollars. It is not difficult to understand why Citibank was not eager to "settle" two and a half million dollars worth of defaults by loaning an additional six million dollars to the defaulting parties who concede that they had no other sources of funding and hence no way of paying the money back.

The record in this case is clear that Citibank was not willing to settle the defaults under the only terms available to Nyland and New York Land and that no other funding sources existed. Accordingly, the possibility of settling these defaults, even if Citibank had given Nyland the additional time Bernstein claims he was promised, was nill. The affirmative defenses of waiver and estoppel are therefore without merit and are dismissed.

### 3. Unclean Hands

The fourth defense alleges that, assuming this foreclosure action to be otherwise proper, Citibank cannot prevail because it had ulterior and improper motives—related to its debt restructuring negotiations with the Philippines—in initiating this action. No relevant authority is cited for this novel contention, and we do not deem it worthy of discussion. That defense is also dismissed.

### 4. Faithless Agent

■ Nyland (SF) also asserts what we shall call the "faithless agent" defense, arguing that since Nyland's President, Joseph Bernstein was disloyal to the company and acting for his own self-interest, Nyland (SF) should not be responsible for his acts. They concede, as they must, that Bernstein was their duly authorized agent and therefore cannot escape the fundamental proposition of agency law that a principal is responsible for the acts of an agent who is acting within the scope of his apparent authority. *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.* (1982) 456 U.S. 556, 566, 102 S.Ct. 1935, 1942, 72 L.Ed.2d 330. If Bernstein was disloyal to Nyland, Nyland can seek to recover its losses from him, but these allegations provide no defense to foreclosure.

5. New York Land's Management Agreement

■ New York Land asserts as both an affirmative defense and a counterclaim that its Management Agreement with Nyland is superior to Citibank's mortgage and therefore survives foreclosure. This is plainly wrong. New York Land does not seriously contend that its management agreement runs with the land. *See Eagle Enterprises, Inc. v. Gross* (1976) 39 N.Y.2d 505, 508, 384 N.Y.S.2d 717, 719, 349 N.E.2d 816, 818; *Neponsit Property Owners Ass'n v. Emigrant Industrial Savings Bank* (1938) 278 N.Y. 248, 15 N.E.2d 793. Instead, it tries to analogize this case to the "equitable obligation" recognized by the Second Department in *Bill Wolf Petroleum Corp. v. Chock Full of Power Gasoline Corp.*, (2d Dept.) 41 A.D.2d 30, 344 N.Y.S.2d 30, *appeal dismissed*, (1973) 33 N.Y.2d 656, 348 N.Y.S.2d 980, 303 N.E.2d 705.

In *Bill Wolf*, a distributor of gasoline sold a parcel of land upon which a gasoline station was to be constructed on the condition that the purchaser "and any subsequent owner, tenant, subtenant or occupant," 344 N.Y.S.2d at 31, purchase all of their gasoline products from the seller for ten years. A "requirements" agreement containing these conditions was duly recorded. When the gasoline station was sold to a third party six years later the question arose whether the buyer assumed the obligation concerning the purchase of gasoline products. While recognizing that the agreement there did not run with the land, the Second Department held that since the agreement to supply gasoline was duly recorded and since the buyer had purchased the premises with full knowledge of its terms it was enforceable as an equitable agreement.

The management agreement at issue here is not an agreement to supply goods, but a personal service contract—just like a contract to mop floors or clean windows—which is in no way binding upon successors

or assigns. *Eagle Enterprises v. Gross* (1976) 39 N.Y.2d 505, 509–510, 384 N.Y.S.2d 717, 720, 349 N.E.2d 816, 819. It is not superior to Citibank's mortgage and both New York Land's affirmative defense and counterclaim based on this theory are hereby dismissed.

6. Tortious Interference

The counterclaims alleging that Citibank's bringing this action tortiously interfered with settlement negotiations in the Philippines action and with New York Land's alleged contract to purchase the building from Nyland, are patently frivolous. By enforcing its rights to foreclose on a mortgage with massive defaults, Citibank was merely protecting its own investment, not intentionally interfering with other agreements.[4]

### CONCLUSION

The affirmative defenses and counterclaims raised by Nyland (PW), Nyland (SF) and New York Land are all lacking in merit. Citibank's motion for partial summary judgment as to those defendants is hereby granted.

SO ORDERED.

---

**4.** Both the settlement proposal and the alleged contract of sale required Citibank's approval. We fail to see how a necessary (and unwilling) party to a proposed agreement can tortiously interfere with its consummation.