690 F.Supp. 1214 (1988)
SECURITY PACIFIC MORTGAGE AND REAL ESTATE SERVICES, INC., Plaintiff,
v.
CANADIAN LAND COMPANY OF AMERICA, N.V., a/k/a Canadian Land Company of America, Inc., NYL, Inc. f/k/a Greatneckers, Inc., d/b/a the New York Land Company, NYL Properties, Inc., the People of the State of New York, the City of New York, Irving Haase & Co., Inc., Lombard Odier & Cie, and the Republic of the Philippines, Defendants.
No. 87 Civ. 3629(PNL).
United States District Court, S.D. New York.
June 28, 1988.
*1215 Weil, Gotshal & Manges, New York City (Michael K. Stanton, Lesley E. Goldberg, Kenneth L. Bressler, Adam L. Wekstein, Konrad L. Cailteux, of counsel), for plaintiff.
Paul, Weiss, Rifkind, Wharton & Garrison (Robert S. Smith, Pamela S. Hoopes, of counsel), Shereff, Friedman, Hoffman & Goodman (Andrew J. Levander, Elliott Dobin, of counsel), New York City, for defendant Canadian Land Co. of America, N.V.
Phillips, Nizer, Benjamin, Krim & Ballon, New York City (Perry S. Galler, Lawrence M. Sands, of counsel), for defendants NYL, Inc. and NYL Properties, Inc.

OPINION AND ORDER
LEVAL, District Judge.
Security Pacific Mortgage and Real Estate Services, Inc. ("Security Pacific"), mortgagee of the building and land at 730 Fifth Avenue in New York City, also known as the Crown Building, moves for summary judgment of foreclosure. The mortgagor Canadian Land Company of America, N.V. does not contest the fact of numerous defaults on its mortgage obligations.[1] Nor does it dispute that the terms of the mortgage agreement permit foreclosure in the event of such defaults. Canadian Land raises a number of affirmative defenses which, it asserts, defeat the claimed entitlement of Security Pacific to summary judgment. The New York Land Company,[2] as manager of the building under a contract with Canadian Land, also asserts affirmative defenses and claims rights under a Management and Development Agreement that supersede those of the mortgagee.[3] No judgment is sought against defendant The Republic of the Philippines. The Philippines has not opposed the motion for summary judgment.
For the reasons discussed below, summary judgment of foreclosure is granted.

*1216 THE PARTIES, BACKGROUND AND PRIOR PROCEEDINGS
Canadian Land is the fee owner of the Crown Building property at 730 Fifth Avenue. New York Land has a contract with Canadian Land to manage and develop the property. NYL Properties Inc. is an affiliate of New York Land. Joseph Bernstein, a principal of New York Land, claims to be the duly appointed managing director of Canadian Land. Karl Peterson, who is affiliated with Adnan Khashoggi, disputes Bernstein's authorization and claims to be the duly appointed managing director of Canadian Land.
The Crown Building is also the subject of an action brought by the Republic of the Philippines which alleges that it and three other Manhattan properties were purchased by Ferdinand Marcos with funds misappropriated from the Philippines. The other properties are Herald Center, 200 Madison Avenue and 40 Wall Street. Security Pacific has a mortgage interest in each of the properties except 40 Wall Street which is under mortgage to Citibank (to which summary judgment of foreclosure was recently granted). Citibank, N.A. v. Nyland, 692 F.Supp. 1488 (S.D.N.Y.1987).
The Philippines' suit was brought March 2, 1986, in New York State Supreme Court against the Marcoses, Canadian Land, New York Land, and others, seeking possession of the properties under a constructive trust theory. That court issued a temporary restraining order prohibiting defendants from impairing the equity value of the properties to the detriment of the Philippines' claim. The case was then removed to this court by reason of diversity and the restraint was continued, first as a TRO and then as a preliminary injunction. See Opinion and Order of May 2, 1986, as amended May 5, 1986, The Republic of The Philippines v. Marcos, 634 F.Supp. 279 (S.D.N.Y. 1986). The Court of Appeals upheld the preliminary injunction on November 26, 1986. 806 F.2d 344 (2d Cir.1986), cert. denied, ___ U.S. ___, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987).
Soon thereafter, the Philippines moved for the appointment of a temporary receiver to manage the properties. On January 13, 1987, I found that precautions were necessary to protect the equity value of the buildings. (Opinion of Jan. 13, 1987), 653 F.Supp. 494 (S.D.N.Y.1987.) I noted the emergency occasioned by numerous defaults at the Crown Building and other properties managed by the New York Land Company, as well as apparent diversions of funds and the serious conflicts of interest on the part of Joseph and Ralph Bernstein, the principals of New York Land. On that basis, this court appointed a Special Property Adviser. (Opinion of April 29, 1987), aff'd, Republic of the Philippines v. New York Land, et al., 852 F.2d 33 (2d Cir. 1988).[4]
In the mortgage foreclosure action concerning 40 Wall Street, Judge Knapp granted summary judgment of foreclosure against the mortgagor Nyland as well as against the New York Land Company on the basis of defaults similar to those at the Crown Building. Citibank, N.A. v. Nyland, 692 F.Supp. 1488 (S.D.N.Y.1987).
Security Pacific Mortgage Corporation, as lender, and Canadian Land Company of America, N.V., as borrower, entered into a Building Loan Agreement on February 22, 1985.[5] Security Pacific agreed to lend approximately $60 million in part to aid in the renovation of the Crown Building and in part to purchase existing mortgages to give Security Pacific a first lien on the property. The parties also executed a Consolidation *1217 Agreement, a mortgage note and a mortgage of the building and its land. The mortgage entitles the Bank to accelerate the indebtedness and to foreclose after a default has occurred. The mortgage was recorded on March 1, 1985. By the time this action was filed in April, 1987, the Bank had advanced over $52 million to Canadian Land under the terms of the Building Loan Agreement.
Since July 1986 Canadian Land has failed to pay interest and late penalties owed under the mortgage. After six months of mounting defaults (totalling more than $2.5 million), the Bank declared the entire unpaid sum of the note due immediately by an Acceleration Letter dated January 26, 1987. Further defaults followed and created a new and independent entitlement to foreclose. By the time the Bank instituted this foreclosure action in April 1987 (after notice and ample opportunity to cure the defaults), Canadian Land had defaulted on over $4 million in unpaid interest and late charges. Additional defaults occurred over the following months and the figure owing the Bank reached nearly $7 million by September 1987 when the motion for summary judgment was filed. In addition, the Bank had paid by September 1987 over $2 million in real property taxes and penalties in order to prevent tax foreclosure proceedings.[6] Bullock Affidavit ¶¶ 21-22. It is conceded that these massive deficiencies have not been cured and that Canadian Land's defaults continue to grow.[7]

DISCUSSION
Canadian Land contends that questions of material fact barring grant of summary judgment of foreclosure arise from the following issues:

1) Waiver

Relying on an affidavit of Joseph Bernstein, defendants Canadian Land and New York Land assert that Security Pacific waived its right to foreclose on the Crown Building mortgage in order to permit the owners to negotiate a sale of the property in settlement of the Philippines action. Bernstein claims that the waiver arose from a statement on November 7, 1986 by John Walsh, an attorney for Security Pacific, that "if approximately $700,000 in ground rent and taxes overdue on Herald Center was paid, [Security Pacific] would refrain from exercising its right of foreclosure against the Crown Building, Herald Center and 200 Madison Avenue."[8] Bernstein Affidavit (10/30/88) at ¶ 5. Defendants offer no documentary evidence of the claimed agreement to forbear. The Bank denies Bernstein's account of his conversation with the Security Pacific attorney. It maintains further that Bernstein's *1218 unsupported affidavit on this point does not create a material issue of fact which would bar summary judgment of foreclosure.
Defendants invoke Nassau Trust Co. v. Montrose Concrete Prod., 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E.2d 1265 (Ct.App. 1982), in support of the contention that summary judgment is inappropriate. There, in reversing a grant of summary judgment, the New York Court of Appeals found "unrefuted facts from which, notwithstanding [mortgagor's] admitted delinquencies, a waiver of the right to declare a default and foreclose may be found by the trier of fact." Id. 451 N.Y.S.2d at 668, 436 N.E.2d at 1270.[9] Specifically, the Court pointed to a letter from an officer of the mortgagee bank referring to a conversation with the President of the mortgagor corporation. By the letter, mortgagee granted an extension of payment and agreed to consider further forbearance for a "period of time necessary to complete a closing" on a proposed sale of the mortgaged property. An affidavit of the President of the mortgagor corporation recounting the same conversation asserted that the bank officer, after reading the text of the letter, had gone further and agreed to "waive any default in meeting [the mortgage] terms until" mortgagor was able to finalize the sale. Noting that plaintiff bank had not disputed the mortgagor's account, the Court found that defendant had raised significant factual issues which, if resolved in its favor, would "constitute an affirmative defense to foreclosure." Id. 451 N.Y.S.2d at 665-67, 436 N.E.2d at 1266-69.
This case is distinguishable in several important respects. First, defendants' allegations, if proven, would not constitute a valid affirmative defense to foreclosure. For even were it true as Bernstein alleges that the Bank agreed to forbear from foreclosing on November 7, 1986, this alleged waiver could protect only against foreclosure based on the defaults existing as of that date. The statement attributed to Walsh could not possibly be construed to waive the right to foreclose on further future defaults. Because significant defaults in the months following the alleged waiver gave rise to a new and independent entitlement to foreclose, the defense of waiver is insufficient as a matter of law. Security Pacific is therefore entitled to summary judgment of foreclosure regardless of any purported agreement by Mr. Walsh to forbear from exercising the rights possessed by the Bank as of November 10, 1986.[10]
Even accepting as true Joseph Bernstein's contention that Security Pacific waived its right to foreclose on the mortgage in November 1986, subsequent events gave rise to a new and independent entitlement to foreclose. Canadian Land defaulted on its obligation to pay approximately *1219 $350,000.00 in interest on December 1, 1986 and another $350,000.00 on January 1, 1987. Consolidation Agreement ¶ D(i). Defendants do not dispute these additional defaults. Nor do they dispute the receipt of a letter from Security Pacific at the end of January, 1987 accelerating the debt and demanding full payment. An additional entitlement to foreclosure arose subsequently because, during the subsequent three months, Canadian Land not only failed to cure its existing defaults but failed to make three additional interest payments totalling more than $1,400,000.00.[11] Having afforded Canadian Land more than ample opportunity to cure its new defaults, Security Pacific instituted this action at the end of April, 1987.
Even if the alleged waiver were broad enough to cover the additional subsequent defaults, Bernstein's uncorroborated affidavit would not show sufficient evidence of a waiver to raise an issue of material fact. The requirements of pointing to specific contested facts in opposing a motion for summary judgment are particularly elevated where the nonmoving party would bear the burden of proof at trial on the affirmative defense of waiver. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). See also Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir.1985).
New York's courts have stringently enforced this rule in the context of claimed waivers of a mortgagee's right to foreclose. It is well established that a disputed, uncorroborated affidavit alleging an agreement to forbear foreclosing a defaulted mortgage is inadequate to withstand a motion for summary judgment. See, e.g., N.Y. State Urban Dev. v. Marcus Garvey Brownstone, 98 A.D.2d 767, 469 N.Y.S.2d 789, 795 (2d Dept.1983) ("A defendant in a foreclosure action who seeks to avoid summary judgment against it where there have been unquestionable defaults must meet a threshold of believability of its claims that there was an oral promise to forgo or delay foreclosure. The bare assertion that certain representatives of the mortgagee made such a promise is not enough to create an issue of fact"); See also State Bank of Albany v. Fioravanti, 51 N.Y.2d 638, 435 N.Y.S.2d 947, 951, 417 N.E.2d 60, 64 (Ct.App.1980); Flintkote Co. v. Bert Bar Holding Corp., 114 A.D.2d 400, 494 N.Y.S.2d 43 (2d Dept.1985); Carteret Savings Bank v. East-West Associates Limited Partnership, (N.Y.Sup.1988) (New York Law Journal, March 10, 1988 at 12).
Recent decisions of the U.S. Supreme Court and of the Second Circuit Court of Appeals emphasize that summary judgment should not be withheld by reason of a technical issue of fact that does not raise a meaningful likelihood of affecting the right to judgment. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Celotex Corporation v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir.1986), cert. denied, ___ U.S. ___, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Binding waivers of the right to invoke remedies under a defaulted mortgage are most unlikely to be conveyed orally without written support. The insubstantiability of defendant's uncorroborated affidavit as to waiver is further underscored by substantial contrary evidence. Matsushita, 106 S.Ct. at 1356.
In a prior affidavit, Joseph Bernstein gave a different (and much more plausible) explanation for the $700,000 payment on November 10, 1986. He stated that this payment of back taxes and overdue ground rent was made in response to the October 15, 1986 letter of the fee owner, John Hancock Mutual Life Insurance Company, threatening to terminate the ground lease on November 14, 1986 if those payments *1220 were not made.[12] Exh. B to Bullock Reply Affidavit, pp. 7-8; SP Exh. O.
Secondly, if Bernstein had received a binding promise from Security Pacific to forbear (and he had paid $700,000 in reliance on it), one would have expected Bernstein to have protested on his receipt or shortly thereafter of the Bank's letter accelerating the entire debt by virtue of the defaults and demanding immediate full payment. Bernstein neither called, nor wrote, nor made any gesture to the Bank suggesting that the notice violated an oral promise to forbear.
Finally, it is highly unlikely that Security Pacific would have agreed to forbear in order to advance the success of the settlement then under discussion in the Philippines action, for the terms of that proposed settlement were highly unfavorable to the Bank. They would have required the Bank to continue for months to advance funds and forbear foreclosure. It strains credulity that the Bank would have agreed to forbear asserting its rights in order to advance the likelihood of a settlement so contrary to its interests. See Bullock Reply Affidavit, ¶ 7. See also Citibank N.A. v. Nyland, 692 F.Supp. 1488, 1490 (S.D.N.Y.1987).
Unlike the mortgagor in Nassau Trust, defendants have failed to meet their burden of designating "specific facts showing that there is a genuine issue for trial" on the issue of a purported waiver. Fed.R. Civ.P. Rule 56(e). See, e.g., Federal Land Bank v. Azapian, 98 A.D.2d 760, 469 N.Y. S.2d 474, 476 (2d Dept.1983) (mortgagor "presented no more than conclusory and contradictory data to support their affirmative defense of estoppel and waiver"); Beacon Federal Savings & Loan Assoc. v. Marks, 91 A.D.2d 1010, 457 N.Y.S.2d 881, 882 (2d Dept.1983) (mortgagor alleging fraud in opposition to motion for summary judgment of foreclosure failed "to present evidentiary facts sufficient to raise a triable issue; mere averments stating conclusions of fact and law are insufficient"); Carteret Savings Bank v. East-West Associates Limited Partnership, (N.Y.Sup. 1988) (New York Law Journal, March 10, 1988 at 12) (allegation of waiver at meeting with bank official contradicted by absence of reference in letter confirming meeting); Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir.1969) ("If there is any dispute as to the material facts, it is only because of inconsistent statements made by" party opposing summary judgment). Cf. Manufacturers and Traders Trust Co. v. Cottrell, 71 A.D.2d 538, 422 N.Y.S.2d 990, 992 (4th Dept.1979) ("triable issue of fact exists" where mortgagor submitted letter to bank confirming existence of waiver agreement). Far from the "unrefuted" factual allegations of waiver in Nassau Trust, defendants have put forth only a conclusory, implausible and unsupported assertion by Joseph Bernstein which is contradicted by his own prior admissions.
I conclude first: even if there were a waiver as of November 10, 1986, it would not bar summary judgment of foreclosure in response to Canadian Land's substantial subsequent defaults[13]; second, Bernstein's highly improbable allegation of oral waiver of the Bank's right to foreclose, denied by the Bank and contradicted by Bernstein's own prior assertion (as well as by common sense), is in any case insufficient under controlling New York precedent to raise an issue of material fact barring summary *1221 judgment of foreclosure.[14]

2) New York Land Management Agreement

New York Land contends that its August 1983 Management and Development Agreement with Canadian Land bars foreclosure of the mortgage. The management company argues that its ten year contract for services (which purports to bind "successors and assigns") is superior to Security Pacific's subsequent mortgage. In the related Citibank foreclosure action of the Nyland property, Judge Knapp has already considered and rejected this argument as an affirmative defense to foreclosure for that mortgagor's defaults. Citibank, N.A. v. Nyland, 692 F.Supp. 1488, 1491 (S.D.N.Y.1987).[15] The terms of the management agreement between Nyland and New York Land are the same as the agreement between Canadian Land and New York Land. Because the identical issue was necessarily decided in the Citibank action where New York Land had a full and fair opportunity to litigate it, collateral estoppel precludes its relitigation here.[16]
In any event, Judge Knapp was clearly correct in holding that a contract for personal services does not run with the land and cannot bind successors or assigns. In Eagle Enterprises, Inc. v. Gross, 39 N.Y. 2d 505, 384 N.Y.S.2d 717, 349 N.E.2d 816 (Ct.App.1976), the New York Court of Appeals held that an agreement to purchase water from the original seller's unrelated parcel of land could not be enforced against a subsequent purchaser. The Court reached this result despite explicit language that the covenant would run with the land because the "obligation to receive water from [seller's parcel] resembles a personal, contractual promise to purchase water rather than a significant interest attaching to [purchaser's] property," and because of the law's concern that an affirmative covenant "imposes an `undue restriction on alienation.'" Id. 384 N.Y.S.2d at 720-21, 349 N.E.2d at 819-20. A contract for the personal services of a managing agent, a fortiori, cannot run with the land because it does not involve exchanged benefits between two parcels of land, and poses a particular risk of restricting alienation by forcing on a subsequent purchaser the services of a particular managing agent. See also Neponsit Property Owners Ass'n v. Emigrant Industrial Savings Bank, 278 N.Y. 248, 15 N.E.2d 793 (Ct.App. 1938).
Moreover, as the agent of Canadian Land, New York Land has no greater rights against foreclosure than Canadian Land. Citibank, N.A. v. Nyland (CF8) Ltd., 839 F.2d 93, 97-98 (2d Cir.1988). Because it can assert only a derivative property interest, the abrogation of New York Land's management contract does not create a bar to summary judgment of foreclosure. Republic of the Philippines v. Marcos, 653 F.Supp. 494, 498 n. 9 (S.D.N.Y. 1987).[17]
*1222 The assertion of the Management and Development Agreement as a bar to foreclosure is rendered all the more frivolous by the fact that New York Land signed on March 26, 1986 a Subordination Agreement which reads:
"all rights and remedies of [New York Land] under the Management and Development Agreement are, and at all times shall continue to be, subject and subordinate in all respects to the Consolidated Mortgages and the lien thereof...."
The Bernsteins contend that the Subordination Agreement is invalid because it was signed under economic duress. This contention is legally insufficient because New York Land has not alleged that it was forced to agree by an unlawful threat which permitted no alternative.[18]First National Bank of Cincinnati v. Pepper, 454 F.2d 626, 632 (2d Cir.1972); Gulf & Western Corp. v. Craftique Productions, 523 F.Supp. 603, 610 (S.D.N.Y.1981). The Bernsteins' further defense that the terms of the Subordination Agreement are vitiated by a prior Letter Agreement dated February 22, 1985 does not help their position. First, the subsequent Subordination Agreement obviously supersedes the Letter Agreement. Moreover, the agreement expressly disclaims any obligation of the Bank to New York Land if the Bank "believes that" a default resulted from New York Land's "unsatisfactory performance." SP Exh. U. And even if New York Land had any rights against Security Pacific under this agreement, they would neither bar foreclosure nor require Security Pacific to employ New York Land after foreclosure. At most, they might expose Security Pacific to an action for damages for breach. The agreement is not relevant to the Bank's right to summary judgment of foreclosure.

3) Faithless Agent

Canadian Land (SF) asserts that it cannot be held responsible for defaults in its mortgage obligations caused by the acts of New York Land which, although its duly appointed agent, was acting contrary to the interests of Canadian Land.[19] This contention is frivolous. If a mortgagor appoints an agent to discharge its obligations under a mortgage, the risks of the agent's incompetence or bad faith surely fall on the party that selected and appointed the agent and not on the mortgagee bank. The notion that it is the adverse party that bears the risk of the bad faith of one's duly appointed agent contradicts all logic and precedent.
Canadian Land (SF) recognizes this general rule of agency law but argues that the Bank falls within the exception for a third party who is not "innocently" relying on the agent's apparent authority, but "knows or has reason to know that the agent is faithless." The problem with the argument is the absence of any factual allegations suggesting that the Bank was aware that New York Land was faithless.
The same defense, furthermore, was considered and rejected by Judge Knapp when advanced by the same interests in the Citibank v. Nyland foreclosure action relating to 40 Wall Street.[20]

*1223 4) Section 1312 of New York's Business Corporation Law

New York Land and Canadian Land assert that N.Y.Bus.Corp.Law § 1312(a) provides an affirmative defense to this action because plaintiff is an unauthorized foreign corporation doing business in New York.[21] Plaintiff, a Delaware corporation with its principal place of business in Colorado, denies that it has been doing business in New York for purposes of § 1312. Nonetheless, it has recently registered to do business in New York in order to resolve any doubt about this issue.[22] Defendant's affirmative defense is therefore moot.[23]

5) Unclean Hands

Canadian Land and New York Land contend that equity will not permit foreclosure in light of purported ties between Security Pacific and Ferdinand Marcos. With no factual basis or specific allegations, defendants contend that Marcos might benefit from a foreclosure sale of the Crown Building. Defendants suggest that Marcos supplied additional collateral or otherwise encouraged Security Pacific to make the original mortgage loan, and that he might gain in some unspecified manner from the sale of the property.
On this issue as well, defendants have failed to establish the existence of a material factual dispute affecting the right to foreclosure. They are therefore not entitled *1224 to bar summary judgment. Beacon Federal Savings & Loan Assoc. v. Marks, 91 A.D.2d 1010, 457 N.Y.S.2d 881, 882 (2d Dept.1983) (mortgagor alleging fraud in opposition to motion for summary judgment of foreclosure failed "to present evidentiary facts sufficient to raise a triable issue; mere averments stating conclusions of fact and law are insufficient"). See also Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir.1985) ("Once a moving party has made a showing that no material issues of fact are in dispute, mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion").
Furthermore, defendants' allegations in support of this affirmative defense are defective as a matter of law. Specifically, there is no contention that the failure of Canadian Land to perform its obligations under the mortgage is in any way attributable to the purported ties between Security Pacific and Marcos, nor that defendants suffered any injury as a result of dealings between the Bank and Marcos. Without a claim of injury, the defense of unclean hands fails as a matter of law. See, e.g., National Distillers and Chemical Corp. v. Seyopp Corp., 17 N.Y.2d 12, 267 N.Y.S. 2d 193, 195, 214 N.E.2d 361, 362 (Ct.App. 1966) (party seeking to invoke doctrine of unclean hands must have been injured by challenged conduct); Mallis v. Bankers Trust Co., 615 F.2d 68, 75 (2d Cir.1980), cert. denied, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981) (same).

6) Responsibility for Construction Delays

As a defense to the allegation (Bullock Affidavit, ¶ 18 (v)) that Canadian Land defaulted through its failure to complete building improvements as required under the Building Loan Agreement, Canadian Land and New York Land claim that Security Pacific caused "many of the alleged defaults" by failing to advance funds in timely fashion. As a result, they contend, Canadian Land was unable to pay contractors who in turn refused to complete their work and filed mechanic's liens. Security Pacific responds that it withheld funding advances only because Canadian Land failed to produce required signatures from Karl Peterson or Carmen Gomez and that delays in funding were caused by Canadian Land's failure to comply with the terms of the Building Loan Agreement. Questions of fact are arguably raised by the issue of whether the signatures were in fact required, and the issue of which party bears primary responsibility for delays in funding constructions draw requests. However, even were these factual issues resolved in favor of defendants, no valid affirmative defense to foreclosure would be established. The issue of responsibility for delays in construction funding and the resulting delay in completion of improvements and mechanic's liens affects only an insignificant few of the defaults on which this motion is based. There are additional undisputed defaults which would not be excused even were the Bernsteins to establish that the Bank wrongfully delayed certain construction advances.[24]

*1225 7) Cross Motion for Discovery

Canadian Land moves for an order under Fed.R.Civ.P. Rule 56(f) permitting discovery on its affirmative defenses of waiver, unclean hands, and Security Pacific's qualification to do business in New York.[25] Rule 56(f) provides:
Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
Defendants have not established that summary judgment should be denied on the ground that discovery is required. First, defendants have failed to specify the particular facts which are sought to be established and how they would create an issue of material fact. Second, even were these requirements met, each of the affirmative defenses sought to be supported by discovery is deficient as a matter of law. No amount of discovery could establish a valid defense on any of the grounds asserted.
The Second Circuit has described the heavy burden faced by a party opposing summary judgment on the grounds that additional discovery is required. A showing by affidavit of the specific facts sought to be established is required. In addition, the proposed means of establishing the facts must be described. Burlington Coat Factory v. Esprit de Corp, 769 F.2d 919, 924-25 (2d Cir.1985).[26] Defendants fail to describe any specific documents or testimony which they contend would support the defenses asserted. See, e.g., SEC v. Spence & Green Chemical Co., 612 F.2d 896, 901 (5th Cir.1980) ("nonmovant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts" (citations omitted), cert. denied, 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981). As the Second Circuit has held, "[a] bare assertion that evidence to support a fanciful allegation lies within the exclusive control of defendants, and can be obtained only through discovery, is not sufficient to defeat a motion for summary judgment." Eastway Const. Corp. v. City of New York, 762 F.2d 243, 251 (2d Cir.1985). See also Contemporary Mission, Inc. v. U.S. Postal Service, 648 F.2d 97, 107 (2d Cir.1981).
In any event, as I stated above, each of the affirmative defenses asserted is inadequate as a matter of law. Even were evidence uncovered through discovery to support defendants' factual allegations, Security Pacific would nonetheless be entitled to summary judgment. The defenses fail, not only for lack of factual support, but also because they are legally deficient. The cross-motion for discovery is denied.

CONCLUSION
The Supreme Court has recently emphasized that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Celotex Corporation v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In this action for foreclosure in response to undisputed defaults, the defenses asserted in opposition to the motion for summary judgment not only lack factual support but are deficient as a matter of law.
Defendants have not met their burden of pointing to specific contested facts which, if resolved in their favor, would defeat the Bank's entitlement to foreclose. This threshold is particularly high where, as *1226-1260 here, the nonmoving party would bear the burden of proof at trial on its affirmative defenses. Celotex, 106 S.Ct. at 2553. New York's courts have stringently applied this principle in assessing defenses to foreclosure. The holdings are best summarized by the language of the New York Court of Appeals in State Bank of Albany v. Fioravanti, 51 N.Y.2d 638, 435 N.Y.S.2d 947, 951, 417 N.E.2d 60, 64 (Ct.App.1980): "to defend against a summary judgment motion in a foreclosure action it is incumbent upon the real property owner ... to produce `evidentiary proof in admissible form ... sufficient to require a trial.... [M]ere conclusions, expressions of hope, unsubstantiated allegations or assertions are insufficient'" (citation omitted). See also Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir.1986), cert. denied, ___ U.S. ___, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (party opposing summary judgment may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment").
Moreover, the affirmative defenses fail as a matter of law. Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) ("the mere existence of factual issues where those issues are not material to the claims before the courtwill not suffice to defeat a motion for summary judgment"). Defendants' factual contentions are not material to the foreclosure issue because, even if true, they do not establish a valid defense to foreclosure. Security Pacific's right to foreclosure is established as a matter of law by uncontested and unexcused defaults.
Because plaintiff has established that it is entitled to judgment as a matter of law and that no issue of material fact exists, the defendants' motion for discovery is denied; summary judgment of foreclosure is granted in favor of plaintiff Security Pacific.
SO ORDERED.
NOTES
[1] Two parties claim authority to speak for, and manage, Canadian Land. The Bernstein faction is represented by Paul, Weiss, Rifkind, Wharton & Garrison. The faction associated with Karl Peterson and Adnan Khashoggi is represented by Shereff, Friedman, Hoffman & Goodman. The same two factions claim to represent Nyland (CF8) in the parallel Citibank foreclosure action before Judge Knapp involving 40 Wall Street, and claim to represent Herald Center, Ltd. in the parallel action for foreclosure of the Security Pacific mortgage on Herald Center. To the extent their positions diverge, the factions will be referred to as Canadian Land (PW) and Canadian Land (SF). Exhibits will be referred to in the same manner. Plaintiff's exhibits will be referred to as SP Exh. ___.
[2] Defendant NYL, Inc., d/b/a The New York Land Company, will be referred to as "New York Land."
[3] In addition, NYL Properties, Inc. asserts a surviving interest in the property by virtue of a claimed executory contract to purchase the Crown Building.
[4] Concern that appointment of a receiver might constitute a default under the Companies' ground leases and mortgages led the court to appoint a Special Property Advisor rather than a receiver. The Special Property Advisor oversees the management of the properties but does not displace the manager and cannot exercise other powers normally held by a receiver. Although the Special Property Advisor makes recommendations concerning leases, contracts, and payments, none may go forward without court approval.
[5] Security Pacific Mortgage Corporation assigned the Canadian Land mortgage agreements to Security Pacific Mortgage and Real Estate Services, Inc. on November 12, 1985.
[6] Mortgagor's failure to make these payments constitutes a default under the terms of the Consolidated Mortgage.
[7] The specific, largely uncontested, instances of default which entitle the Bank to foreclose arise from Canadian Land's failure to comply with numerous obligations under the mortgage agreements:

(i) failing and omitting to pay monthly interest charges since July 1, 1986 and each and every month thereafter;
(ii) failing and omitting to pay after demand, late payment charges on account of non-payment of interest;
(iii) failing and omitting to discharge, by bonding or otherwise, mechanic's liens filed against the Premises within 45 days of such filing;
(iv) failing and omitting to pay New York City real estate taxes due on July 1, 1986 and January 1, 1987 and failing and omitting to pay sewer and/or water charges, all as required by the Consolidated Mortgage;
(v) failing and omitting to perform its obligations under the Building Loan Agreement to complete the Phase I Improvements by April 1, 1986, Phase II Improvements by August 1, 1986, and Tenant Finish Work by December 31, 1986;
(vi) failing and omitting to use the Net Operating Income of the Improvements to pay interest that has become due; and
(vii) failing and omitting to eliminate a Deficiency (as defined in Paragraph 14 of the Building Loan Agreement) although duly demanded.
[8] It is not disputed that the Bernstein interests made the $700,000 payment of rent and taxes on November 10, 1986. The Bank maintains, however, that the payment was not made in consideration for any agreement on its part to forbear from foreclosure, but rather in response to a notice from the Herald Center lessor threatening to terminate the Ground Lease of Herald Center, Ltd.
[9] The Court defined waiver as "the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." 451 N.Y.S.2d at 668, 436 N.E.2d at 1269-70.
[10] The purported waiver could not possibly be construed to deprive the Bank of the right to foreclose based on subsequent defaults. But even if it were so construed, any waiver was properly withdrawn by the subsequent Acceleration Letter. As the Court of Appeals noted in Nassau Trust, a waiver can "be withdrawn, provided the party whose performance has been waived is given notice of withdrawal and a reasonable time after notice within which to perform." Nassau Trust, 451 N.Y.S.2d at 668, 436 N.E.2d at 1270. See also Barclay's Bank v. Smitty's Ranch, 122 A.D.2d 323, 504 N.Y.S.2d 295, 297 (3d Dept.1986) ("Any waiver of previous noncompliance was rescinded once plaintiff asserted that compliance was required"); Carteret Savings Bank v. East-West Associates Limited Partnership, (N.Y.Sup.1988) (N.Y.Law Journal, March 10, 1988 at 12) (suggesting purported waiver withdrawn by mortgagee's subsequent refusal to pay loan advance).

The Nassau Trust holding denying summary judgment was premised on the absence of evidence "other than the commencement of the foreclosure action to suggest that plaintiff gave notice of withdrawal." Id. 451 N.Y.S.2d at 664, 436 N.E.2d at 1266. In contrast, Security Pacific's notice of acceleration on January 26, 1987 constituted withdrawal of any waiver that might have existed (at least with respect to the additional subsequent defaults), and the three months between that notice and the initiation of this action provided more than adequate opportunity for Canadian Land to cure its original and subsequent defaults. In fact, the mortgage agreements do not require an opportunity to cure before foreclosure.
[11] Because mortgagor is entitled to no notice prior to acceleration of the debt (the notice of the Acceleration Letter was gratuitous), both the defaults before the Acceleration Letter and those after the Letter and before the filing of the complaint constitute independent grounds for entitlement to foreclosure. Consolidation Agreement Exhibit C, ¶¶ 21(a), 38.
[12] In disputing Bernstein's allegations of an agreement to forbear, John Walsh recounts a series of conversations with Bernstein on November 7, 1986. He concedes that Security Pacific was concerned with Hancock's threatened termination of the ground lease at Herald Center (because the lease constituted the entire security for their mortgage at Herald Center) and that he may have indicated that Security Pacific would pay the overdue rents and taxes if Bernstein did not. He specifically denies agreeing to waive any rights to foreclose in return for the Bernsteins' making the overdue $700,000 payments.
[13] See e.g., Johnson v. Gaughan, 128 A.D.2d 756, 513 N.Y.S.2d 244, 245 (2 Dept.1987) ("even if accepted as true, [defendant's allegations] do not in any way affect the validity of the plaintiff's mortgage, and do not constitute a meritorious defense to the plaintiff's motion for summary judgment").
[14] To the extent, the defendants advance the same arguments in support of an "estoppel," they fail for the same reasons, and others. See Citibank, N.A. v. Nyland, 692 F.Supp. 1488 (S.D.N.Y.1987).
[15] See also Citibank, N.A. v. Nyland (CF8) Ltd., 839 F.2d 93, 97-98 (2d Cir.1988) (New York Land's claimed "exclusive right to manage and lease" property "is subordinate to [receiver's] obligation to preserve the premises." Because New York Land was acting as Nyland's agent, "New York Land's interests were subject to the appointment of a receiver for the premises to the same extent as Nyland's.").
[16] The fact that a receiver had been appointed in the Nyland case prior to foreclosure has no bearing on the determination of this legal issue and does not affect the conclusion that Judge Knapp's decision on this issue is controlling here.

Canadian Land has no better claim to evade the effect of collateral estoppel and assert this defense on behalf of New York Land. See note 21, infra.
[17] These principles mandate the same conclusion regarding the contention of NYL Properties, Inc. that its claimed right to purchase the property survives foreclosure. This related Bernstein entity rests its claim to a right to purchase the Crown Building on a memorandum of executory contract recorded on February 25, 1986. Because the Consolidated Mortgage was recorded on March 1, 1985, any rights of NYL Properties are necessarily subject to the Security Pacific mortgage. In addition, NYL Properties executed a Subordination Agreement with Security Pacific on March 26, 1986 agreeing that its rights are "subject and subordinate in all respects to the Consolidated Mortgages." SP Exhibit V.
[18] To the extent New York Land asserts the coercion claim as an independent basis for general equitable relief from foreclosure under the doctrine of unclean hands, it is rejected for the same reason.
[19] Canadian Land (SF) concedes that New York Land was acting within the scope of its apparent authority, but contends that because Security Pacific had "long been aware of the Bernsteins' failure to make timely payments on behalf of Canadian Land," the bank must be charged with the knowledge that New York Land was acting contrary to the interests of its principal in failing to make payments. The logical leap called for by this argument is unwarranted in the absence of any factual allegations suggesting that the Bank was aware that New York Land was faithless. Cf. Rouse Woodstock v. Surety Federal Savings & Loan Assn., 630 F.Supp. 1004, 1010 (N.D.Ill.1986).
[20] The Peterson faction claiming ownership of the Crown Building is apparently the same interest as the Peterson faction in the Nyland case. Even if they might be characterized as distinct entities, Canadian Land (SF) cannot escape the preclusive effect of Judge Knapp's ruling because the doctrine of collateral estoppel is applicable to related entities in privity where they are controlled (or claimed to be controlled) by the same party. Gramatan Home Investors Corp. v. Lopez, 46 N.Y.2d 481, 414 N.Y.S.2d 308, 311-12, 386 N.E.2d 1328, 1332 (Ct.App.1979) ("the party sought to be collaterally estopped in the current action need not have been the one for or against whom judgment was rendered in the previous action.... collateral estoppel bars not only parties form a previous action from litigating an issue decided therein, but those in privity with them as well"); Tolley v. American Transit Ins. Co., 638 F.Supp. 1191, 1194 (S.D.N. Y.1986) ("Privity may also arise from a nonparty's active participation in or control over a lawsuit"); In Re Shea's Will, 309 N.Y. 605, 617, 132 N.E.2d 864 (Ct.App.1956) (party bound by collateral estoppel by judgment against party on identical issue if "`identified with him in interest.'.... A clearer case for application of the doctrine could hardly be imagined than one involving successive attempts to litigate the same question by a corporation and by its owner or owners").
[21] foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without authority. This prohibition shall apply to any successor in interest of such foreign corporation.
N.Y.Bus.Corp.Law § 1312(a) (McKinney 1986).
[22] See SP Exh. A. Defendants contend that this action should nonetheless be dismissed because plaintiff registered under the statute only after commencing this litigation. Under New York law, however, it is clear that plaintiff may cure its incapacity in the course of this litigation. Hooton Chocolate Co. v. Star Chocolate Novelties, 63 Misc.2d 482, 311 N.Y.S.2d 698, 699 (Sup. Ct.Columbia Co. 1970) ("a foreign corporation [may] become authorized after it has already conducted business in this state"); Burlington Industries v. Salem International Co., 645 F.Supp. 872, 873 (S.D.N.Y.1986) (Weinfeld, J.) ("The New York courts have consistently held that lack of good standing is not a bar to commencing suit, is not a ground for dismissal, and that a plaintiff may continue an action as soon as it regains good standing") (citations omitted).
[23] Defendants object that mere registration is inadequate and that plaintiffs must also satisfy any outstanding obligations for unpaid "fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without authority." B.C.L. § 1312(a).

Defendants, however, make no specific allegation that back taxes or fees are owing. The State has accepted the Bank's registration certificate. See Oliver Promotions Ltd. v. Tams-Witmark Music Library, Inc., 535 F.Supp. 1224, 1228 (S.D.N.Y.1982) ("defendant seeking to invoke section 1312(a) to terminate a suit by its adversary bears the burden of establishing that the plaintiff has not met the section's requirements."); Astro Dye Works, Inc. v. Genesco, Inc., N.Y.L.J. at 2, col. 5 (App.Term 1st Dept.) (Nov. 19, 1969) ("showing an outstanding unpaid assessment" required to establish defense under § 1312(a)).
In any event, defendants should not be permitted to assume the role of tax assessor claiming deficiencies that are not claimed by the State. As noted, the State has not withheld approval of plaintiff's registration in order to extract any taxes owed.
[24] The most obvious of these inexcusable defaults is the continuing failure to pay interest charges and late payment charges owed the Bank and taxes owed the City (which under the terms of the Mortgage are the responsibility of the mortgagor). Even after the January 26, 1987 Acceleration Letter calling the entire loan, the Bernsteins defaulted anew by failing to make interest payments to Security Pacific. This default alone constitutes adequate ground for foreclosure under the terms of the Building Loan Agreement.

The Bernsteins claim that interest payments due under the Crown Building mortgage were not paid on the basis of March 1986 conversations with a Bank representative who "advised" Joseph Bernstein to transfer "excess monies" to Herald Center in order to make up a continuing cash-flow shortfall at that building. Affidavit of Joseph Bernstein, July 21, 1987, ¶ 9. Whatever the merits of this contention, it is inadequate as a matter of law as a defense to the defaults which occurred after the Acceleration letter in January, 1987. After receipt of the Acceleration Letter which specifically listed as defaults the unpaid interest charges, it would not have been possible for the Bernsteins to believe that Security Pacific authorized the witholding of interest payments due on the Crown Building mortgage.
[25] New York Land also seeks discovery on its contention that it entered the March 26, 1986 Subordination Agreement as a result of coercion and economic duress. Because New York Land is precluded by collateral estoppel from litigating this claim (and because the claim is deficient as a matter of law), I need not address the firm's entitlement to discovery.
[26] "[I]t has been held that the failure to file such an affidavit under Rule 56(f) is by itself enough to reject a claim that the opportunity for discovery was inadequate." Burlington Coat Factory, 769 F.2d at 926.