■ NEW YORK STATE URBAN DEVELOPMENT CORP., Respondent, v MARCUS GARVEY BROWNSTONE HOUSES, INC., et al., Defendants, and DUBOR ASSOCIATES, Appellant. — In a mortgage foreclosure action, defendant Dubor Associates appeals, as limited by its notice of appeal and its brief, from so much of an order of the Supreme Court, Kings County (Spodek, J.), entered December 2, 1980, as granted plaintiff's motion to dismiss all the affirmative defenses and counterclaims interposed in Dubor Associates' answer, as against plaintiff and granted summary judgment to plaintiff as against Dubor Associates. Order affirmed, insofar as appealed from, with costs. Plaintiff New York State Urban Development Corporation (UDC), a corporate government agency and public benefit corporation of this State (L 1968, ch 174, § 4), was established as part of a State program to encourage the private sector 'to invest in, develop, construct, and operate low-income housing in blighted areas (L 1968, ch 174, § 2). As a means of accomplishing its statutory purpose, UDC would provide low-interest loans for 95% of a low-income housing project's cost, secured by a nonrecourse mortgage. The private investor contributes the remaining 5% as its equity contribution. If foreclosure does not occur, potential tax benefits are available to the private investor and often served as a primary inducement for investing in the project. In May, 1979, UDC commenced this action to foreclose its consolidated mortgages, in the total amount of $30,054,000, on a 625-unit, low-income, residential project in Brooklyn known as Marcus Garvey Park Village (the project). The default was based upon the alleged failure of the mortgagor to pay installments of interest and lending agency's charges dating back to June 1, 1976, to pay real estate taxes, water rates and sewer rents, and to maintain the mortgaged premises in good condition and repair. Legal title to the project was vested in the mortgagor defendant Marcus Garvey Brownstone Houses, Inc. Marcus Garvey Brownstone Houses, Inc., a subsidiary of UDC and a general partner of defendant Dubor Associates, did not serve an answer in this action. Defendant Dubor Associates (Dubor), a limited partnership, is the equitable and beneficial owner of the mortgaged premises, having contributed funds equal to 5% of the actual project's costs. The balance was provided by the UDC and was secured by the mortgages herein sought to be foreclosed. Under the terms of said mortgages, UDC's only security for repayment of its loan is the project itself. The partners of Dubor are not personally liable for the mortgage debt since the mortgage instruments do not provide for recourse against Dubor. Dubor was made a party to the action essentially to bar any equity of redemption that it might claim. Dubor answered the complaint, admitted that some installments of interest and lending agency charges had

not been paid by the mortgagor and interposed 13 affirmative defenses and five counterclaims. Thereafter, UDC moved, *inter alia,* to dismiss Dubor's affirmative defenses and counterclaims and for summary judgment of foreclosure. Since both parties submitted extensive evidentiary matter as to all branches of the motion, Special Term treated the entire motion as one for summary judgment and granted judgment in favor of UDC as against Dubor upon the ground that there were no issues of fact. We agree. Insofar as pertinent to the issues addressed on this appeal, the following facts have been culled from the documentary evidence submitted by the parties, the substance of which is not in dispute. On or about October 30, 1973, Dubor Construction Corp. (Dubor's predecessor) executed a development letter agreement in which it agreed to be the developer of the project and to provide equity capital in an amount equal to 5% of the estimated project cost, plus 5% of any excess costs. Dubor Construction Corp. acknowledged receipt of "Financial Estimates" and "financial schedules", which contained, *inter alia,* UDC's preliminary computation of the estimated project cost. With regard to the "Financial estimates" and "financial schedules" prepared by UDC, the agreement recited specifically that the amounts were "estimates only", that UDC made "no warranty or representation with respect to such estimates or with respect to * * * the financial feasibility" of the project and that Dubor Construction Corp. would independently verify the estimates prior to the 1974 mortgage loan closing. At the August 21, 1974 closing, Marcus Garvey Brownstone Houses, Inc. executed and delivered to UDC a note in the principal sum of $27,562,000 (95% of the estimated project cost) and the mortgage securing payment thereof. The mortgage made the failure to pay debt service an event of default. On the same date, UDC, Marcus Garvey Brownstone Houses, Inc., as the legal owner, and Dubor, as the equitable owner, executed an "Equity and Regulatory Agreement", and a "Declaration of Interest". Section 2.1 (d) of the "Equity and Regulatory Agreement" provided that Dubor would be obligated to provide 5% of any additional project completion costs upon receipt of a notice in writing, that in UDC's "judgment certain specified costs in excess of the Estimated Project Costs must be incurred * * * for * * * completing the Project in accordance with the Drawings and Specifications" and that UDC "will increase the maximum amount of the Loan by ninety-five percent of the amount of such specified additional costs". Section 3.3 of said agreement stated that "[i]t is expressly understood that * * * UDC makes no warranties or representations of any kind (a) with respect to any * * * financial schedules * * * provided [to Dubor] in connection with the project, (b) with respect to availability of Governmental subsidies or (c) with respect to the feasibility of the Project" and that Dubor's use or reliance upon such documents or information is "at their own risk". The "Declaration of Interest" acknowledged that Dubor's equitable interest in the project was subordinate and subject to the lien of the mortgage to UDC. The development letter agreement, the "Equity and Regulatory Agreement", and the mortgage specifically provided that the provisions could not be modified or waived except in writing. Thereafter, UDC determined that specified costs, in the amount of $2,623,297 in excess of the estimated project costs would be incurred to complete the project and that it would furnish 95% of said costs. Pursuant to the "Equity and Regulatory Agreement" of August 21, 1974, UDC provided Dubor with written notice of its determination. On November 18, 1977, UDC and Dubor entered into a letter agreement regarding the final project construction costs which stated that UDC would increase its loan to provide 95% of the excess construction costs, with Dubor "obligated to provide" its 5% share. On said date, a second mortgage loan closing took place. Marcus Garvey Brownstone Houses, Inc. executed and delivered to UDC a note for $2,492,000 and a second mortgage to secure the additional UDC loan in

accordance with Dubor's authorization contained in the letter agreement. The additional mortgage expressly provides that upon the occurrence of an event of default, such as failure to pay debt service when due, UDC may "proceed to protect and enforce [its] rights * * * by an action * * * for foreclosure of the lien of this mortgage". The additional mortgage also expressly makes a default under the original mortgage an event of default. The letter agreement also authorized a "Consolidation Agreement" which was executed on that date, whereby the original 1974 mortgage and the additional 1977 mortgage were combined to constitute a single lien securing the aggregate principal sum. The "Consolidation Agreement" contained a certification by the mortgagor "that *there are no offsets or defenses to the Consolidated Mortgages * * * or to the* indebtedness secured thereby". It also contained a no-change-unless-in-writing clause. As Special Term noted, the documentary proof submitted in support of UDC's motion for summary judgment "establishes beyond peradventure that the plaintiff is *prima facie* entitled to such relief". "[W]here the moving party has demonstrated its entitlement to summary judgment, the party opposing the motion must demonstrate by admissible evidence the existence of a factual issue requiring a trial of the action or tender an acceptable excuse for his failure so to do" (*Zuckerman v City of New York,* 49 NY2d 557, 560). Consequently, the opposing papers must be evaluated to determine whether the defenses pleaded in Dubor's answer are real and genuine and capable of being proved at trial. The only affirmative defenses and counterclaims interposed in Dubor's answer which warrant discussion on this appeal pertain to Dubor's assertions that it was fraudulently induced to enter into the 1974 transaction by its reliance on UDC's financial schedules and projections, and that Dubor was fraudulently induced to increase its contribution in 1977 by its reliance on oral assurances by two UDC employees that UDC would not foreclose. In the affidavits submitted in opposition to plaintiff's motion, a vice-president and a general partner of Dubor, Samuel C. Florman, claimed that at numerous meetings held between 1973 and 1977, officials of UDC represented that the financial schedules and projections which UDC prepared and disseminated were accurate and reliable and that the project's rental income would be sufficient to pay not only current maintenance and operating expenses but monthly debt service to UDC as well. It was alleged that, in reliance on UDC's representations as to the project's financial viability, which were allegedly false when made or made with reckless disregard for their accuracy, Dubor invested in the project to its detriment. Both the development letter agreement, dated October 30, 1973, and the "Equity and Regulatory Agreement", dated August 21, 1974, contain clauses specifically disclaiming any oral representation or warranty made by UDC with respect to the accuracy of the financial schedules and estimates provided to Dubor and as to the financial feasibility of the project. Pursuant to these specific disclaimers, Dubor has in the plainest language announced and stipulated that it is not relying on any specific representation and warranty as to the very matter concerning which it now claims it was defrauded. Such specific disclaimers refute the allegations in Dubor's answer that the agreement was executed in reliance upon these contrary representations (see *Danann Realty Corp. v Harris,* 5 NY2d 317, 319). Additionally, in Dubor's papers in opposition to UDC's motion for summary judgment, it was alleged that in late 1977, when Dubor was requested to furnish 5% of the additional costs to complete the project, the project was not generating sufficient income to pay debt service due to a large number of vacancies. Vice-President Samuel C. Florman averred that two UDC officials — Lawrence Rosenfeld, a mortgage analyst, and Susanna Fodor, an associate counsel — made the following representations to him at different meetings held subsequent to the August 21, 1974 mortgage closing but prior to the

execution of the 1977 agreements: "(i) a modification or restructuring * * * of debt service due to UDC would be implemented so that rental income from the Project income would be sufficient * * * to meet its expenses, including debt service; or (ii) if necessary, sufficient additional funds would be provided by UDC to meet the Project's expenses, including debt service [i.e., a "workout" would be arranged] and that (iii) foreclosure 'would never happen' ". According to Florman, it was in reliance upon these assurances that Dubor furnished the additional funds and authorized Marcus Garvey Brownstone Houses, Inc. as the record owner to execute the 1977 documents relating to the additional mortgage, including the "Consolidation Agreement". The mortgage analyst and the associate counsel for UDC categorically denied these allegations. Mr. Rosenfeld averred that as senior mortgage analyst, he compiled and analyzed financial and operating data for UDC's residential projects. He asserted that, since he was not a UDC corporate officer, as Florman well knew, he had no authority to make any policy commitments as to whether or not UDC would ever foreclose on a project or agree to do a "workout" in lieu of foreclosure. Associate counsel Fodor averred that after the middle of September, 1977, she was no longer assigned to work on UDC's residential mortgage projects and did not participate in any negotiations relative to, or the drafting of the underlying documents comprising the November, 1977 agreements. We reject Dubor's contention that questions of fact exist as to whether Dubor was fraudulently induced into investing additional funds in the project in 1977 and whether UDC is estopped or has waived its right to foreclose before it attempted in good faith to arrange a "workout" or the means by which the project's income could be made adequate to meet current expenses and debt service. Initially, we note that Dubor has omitted to state in detail the circumstances of the alleged oral representations regarding a modification or restructure of the loan with the requisite specificity for defenses based upon misrepresentation and fraud (CPLR 3016, subd [b]), or to lay bare its proof regarding said defenses (see *Northeast Small Business Inv. Corp. v Waccabuc Investors,* 90 AD2d 538). Assuming, *arguendo,* that the oral representations were made by the stated UDC employees, Dubor must prove justifiable reliance to establish fraudulent inducement, estoppel, or waiver. With respect to the element of reliance, it is improbable that Dubor's principals, who were particularly experienced and sophisticated participants in UDC projects and who were represented by experienced counsel in such transactions, did not know that a UDC mortgage analyst and an associate counsel lacked express or apparent authority to orally bind the UDC to attempt a "workout" before commencing foreclosure proceedings. We are cognizant of the rule that the improbability of reliance upon the claimed misrepresentation is insufficient, standing alone, to provide a basis to grant summary judgment (*Millerton Agway Coop. v Briarcliff Farms,* 17 NY2d 57). However, the burden cast upon Dubor, as the party opposing a motion for summary judgment, is not met by bald conclusory assertions which defy reality and are inconsistent with the pattern of events and the documentary evidence in support thereof (*Kramer v Harris,* 9 AD2d 282, 283). Here the terms of the 1973 development letter agreement, the 1974 "Equity and Regulatory Agreement" and the 1977 "Consolidation Agreement" are so completely inconsistent with the alleged oral representations that Dubor's contention of reliance is, in the words of Special Term, "incredible and strains to the breaking point the credulity of this court". Dubor's furnishing of 5% of the additional project's completion costs and execution of the additional mortgage documents could not have been based upon reliance on the alleged oral representations since under section 2.1 (d) of the "Equity and Regulatory Agreement", dated August 21, 1974, Dubor was obligated to provide these funds (upon the occurrence of a stated event), as was its predecessor Dubor

Construction Corp., pursuant to the development letter agreement, dated October 30, 1973. Dubor cannot claim to have been defrauded into doing what it already was legally bound to do (*Vanderbilt v Schreyer,* 91 NY 392; 12 Williston, Contracts [3d ed], § 1515; see, also, *Hudson City Sav. Inst. v Burton,* 88 AD2d 728). Moreover, the November 18, 1977 "Consolidation Agreement", which Dubor authorized the mortgagor to execute *after* the alleged representations to forego or delay foreclosure were made, expressly provided that the mortgagor "certifies" that *"there are no offsets or defenses"* to the consolidated (i.e., original and additional) mortgages or to the indebtedness secured thereby. Said release, in the face of a provision of the mortgage instrument expressly granting UDC the right to protect and enforce its rights by an action for foreclosure of its lien upon an event of default, such as the failure to pay debt service, negates Dubor's claim of reliance upon any oral promises to forego or delay foreclosure (see *Danann Realty Corp. v Harris, supra*). In the face of the outstanding conflict between the alleged oral representations and the uncontroverted documentary evidence containing the written terms of the letter agreement, the "Equity and Regulatory Agreement" and the "Consolidation Agreement", appellant cannot claim justifiable reliance and, thus, has failed to establish the elements of a defense of fraud in the inducement or estoppel (see *Merchants Nat. Bank & Trust Co. v Syracuse Eagles Hockey Club Corp.,* 58 AD2d 1004). *Nassau Trust Co. v Montrose Concrete Prods. Corp.* (56 NY2d 175), relied upon by appellant in support of the defense of waiver is distinguishable. In that case, the Court of Appeals concluded that the mortgagee's oral waiver of the right to accelerate the principal and foreclose in order to give the delinquent mortgagor a reasonable opportunity to negotiate an unforced sale of the mortgaged premises, constituted a valid defense to a foreclosure action, absent withdrawal of the waiver upon reasonable notice to the mortgagor. Unlike the instant case, in *Nassau Trust Co. (supra),* the mortgagor's affidavits opposing the mortgagee's motion for summary judgment of foreclosure stated detailed facts and not merely conclusions as to the alleged oral representations to forego foreclosure, which were made by an officer of the mortgagee, who indubitably had authority to bind the mortgagee. Moreover, the oral promises to forego foreclosure were allegedly made *after* the execution of a mortgage extension agreement which, pursuant to its express terms, could not be changed or terminated orally, and the mortgagor additionally alleged facts to show conduct in reliance upon said representations. Here, the oral representations to forego foreclosure until a "workout" could be arranged were allegedly made *prior* to the execution of the 1977 mortgage documents, which contain an express clause releasing or disclaiming any offset or defense the mortgagor and Dubor had against UDC's right to foreclose. The release is sufficiently broad to encompass a defense predicated on an oral waiver to forego a right to foreclose until a "workout" could be arranged. Thus, said release not only negates any allegation of reliance upon representations made before the agreement was executed (cf. *Chase Manhattan Bank v Edwards,* 59 NY2d 817), but suffices as a withdrawal of any prior waiver on the part of UDC of its right to foreclose until a workout could be arranged, assuming such representation was made as claimed. A defendant in a foreclosure action who seeks to avoid summary judgment against it where there have been unquestionable defaults, must meet a threshold of believability if it claims that there was an oral promise to forego or delay foreclosure. The bare assertion that certain representatives of the mortgagee made such a promise is not enough to create an issue of fact (cf. *Nassau Trust Co. v Montrose Concrete Prods. Corp., supra,* p 185). Thompson, J. P., O'Connor, Brown and Rubin, JJ., concur.