**CITIBANK, N.A., Plaintiff–Appellee,**

v.

**NYLAND (CF8) LTD., The Republic of the Philippines, Defendants–Appellants,**

**New York Land Company a/k/a Great Neckers Realty, Inc., et al., Defendants.**

Nos. 1049, 1050 Dockets
89–7072, 89–7076.

United States Court of Appeals,
Second Circuit.

Argued May 2, 1989.

Decided June 29, 1989.

Robert S. Smith, Andrew J. Levander, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for defendant-appellant, Nyland (CF8) Ltd.

Jeffrey J. Greenbaum, New York City (Clive S. Cummis, James M. Hirschhorn, Sills Cummis, Zuckerman Radin Tischman Epstein & Gross, New York City and Morton Stavis, Center of Constitutional Rights, New York City, on brief), for defendant-appellant, Republic of the Philippines.

Robert M. Abrahams, New York City (Alan R. Glickman, Mark E. Kaplan, and Sherry K. Cohen, Schulte Roth & Zabel, New York City, on the brief), for plaintiff-appellee.

Before LUMBARD, FEINBERG and NEWMAN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

The reverberations from Ferdinand Marcos's fall from power have been felt in numerous American courtrooms and have managed to complicate this otherwise unexceptional suit to foreclose a second mortgage on commercial property in Manhattan. Nyland (CF8) Ltd. ("Nyland") and the Republic of the Philippines appeal from the judgment of the District Court for the Southern District of New York (Whitman Knapp, Judge) granting summary judgment to Citibank, N.A. ("Citibank" or "the bank") in an action to foreclose the bank's second mortgage on Nyland's leasehold interest in 40 Wall Street, an office tower located in lower Manhattan. 692 F.Supp. 1488. Nyland asserts a number of affirmative defenses to the Court's judgment of foreclosure. Its main substantive contention is that Citibank waived its right to foreclose immediately upon an event of default. In addition, appellants challenge the Court's enforcement of various mortgage provisions that provide for the payment of "default rate" interest and other sums to Citibank, monies that the bank may recoup from the proceeds of the forced sale of the property. We find that the Court's rejection of Nyland's affirmative defenses to foreclosure was entirely proper, as was its assessment of the amounts owing to the mortgagee. We therefore affirm the District Court's judgment of foreclosure in all respects.

## Facts

In 1984, Citibank and Nyland entered into a mortgage agreement under which the bank agreed to lend Nyland $39,225,000 in return for a second mortgage on Nyland's leasehold interest in 40 Wall Street. The mortgage was negotiated and signed by Joseph Bernstein, as managing director of Nyland. Nyland's managing agent for the property was the New York Land Company ("New York Land"), of which Bernstein was president. From 1984 through 1986, Nyland was chronically late in interest and tax payments. By mid-November, 1986, Nyland owed $424,957.84 in interest payments, $49,928.43 in late charges, and $2,102,958 in real estate taxes. The failure to make these payments constituted events of default under the second mortgage. On November 19, Citibank accelerated repayment of the debt pursuant to a provision of the mortgage and commenced this foreclosure action in New York Supreme Court. The original defendants included Nyland, New York Land, and the Republic of the Philippines, as well as New York City, New York State, and the United States.

This litigation has been complicated from the outset by an unresolved dispute between two groups of investors, each claiming the exclusive right to represent Nyland. One group, led by Joseph Bernstein, is represented by the law firm of Paul, Weiss, Rifkind, Wharton & Garrison; we will refer to claims by this group as those of "Nyland (PW)." The rival group is led by Karl Peterson, who is affiliated with the international financier Adnan Khashoggi. Peterson is represented by Shereff, Friedman, Hoffman & Goodman; this group will be referred to as "Nyland (SF)."

The dispute over Nyland's representation is not before this Court, but it is a key

issue in a related suit brought by the Philippines and currently pending in the Southern District before Judge Leval. The Philippines commenced that action in 1986 against Nyland and other defendants, asserting that the leasehold interest in 40 Wall Street and in three other Manhattan properties had been purchased on behalf of the ousted former President of the Philippines, Ferdinand Marcos, and his wife, Imelda Marcos, with funds allegedly stolen from the Philippines' national treasury. The Philippines is seeking possession of these properties through the formation of a constructive trust. In a ruling that bears significantly on the outcome in this litigation, Judge Leval issued a preliminary injunction barring the transfer or encumbrance of the alleged Marcos properties, including 40 Wall Street, pending the adjudication of the Philippines' claims. *See New York Land Co. v. Republic of the Philippines*, 634 F.Supp. 279 (S.D.N.Y. 1986), *aff'd.*, 806 F.2d 344 (2d Cir.1986), *cert. dismissed*, 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987).

The Philippines, which had been joined as a defendant in Citibank's state court foreclosure action because of its competing claim to 40 Wall Street, *see* N.Y.Real Property Actions and Proceedings Law § 1311 (McKinney 1979), removed the case to the Southern District, pursuant to 28 U.S.C. § 1441(d) (1982). Thereafter, Judge Knapp granted summary judgment to Citibank against Nyland and New York Land, rejecting these defendants' eleven affirmative defenses to foreclosure. The City and State subsequently consented to entry of judgment, and the United States was dismissed as a party. Citibank then reached a settlement with the Philippines. The Philippines agreed to an entry of judgment of foreclosure but retained the right to bring an action against Citibank to recover any disbursed funds for which it could establish an entitlement.[1]

Judge Knapp entered a final judgment of foreclosure and sale, a stay of which was denied by the District Court and by this Court. As stated in the District Court's judgment, the amounts that Citibank may recoup from the proceeds of the sale include: (1) $38,341,232.87 of principal (the amount advanced to date); (2) interest accruing at a "default interest rate" of 17.5%—an increase of four percentage points over the regular rate—for the major portion of the principal debt ($37.5 million) and an extra three percent over the regular floating rate formula governing the remaining portion, dating from the bank's declaration of default on November 19, 1986, to the entry of final judgment; (3) late charges of $49,928.43; (4) $6,263,291.16 advanced by Citibank in July, 1987, for unpaid real estate taxes on the property owed by Nyland, plus interest from the date of the advance; (4) attorney's fees of $813,131.34; and (5) interest on these sums from the date of judgment until the date of payment. Judge Knapp also ordered that any monies from the sale remaining after Citibank is paid are to be transferred to the Philippines' action pending before Judge Leval.

### Discussion

## I. Waiver and Estoppel of Foreclosure

■ Nyland (PW)'s primary defense to foreclosure is that it received oral assurances from a responsible Citibank officer that the bank would not foreclose on the second mortgage without giving Nyland the opportunity to cure its defaults. These assurances, Nyland (PW) asserts, constituted a waiver of Citibank's foreclosure rights under the second mortgage and estopped the bank from accelerating the debt and initiating a foreclosure action. The only support for Nyland's assertion is Bernstein's statement in an affidavit in opposi-

---

1. 1. The settlement agreement provides in relevant part:

    The Philippines expressly reserves whatever rights it has to contest in the foreclosure action (a) the dollar amount of any judgment entered in the foreclosure action in excess of the principal amount (less any payments on account thereof) of Citibank's second mortgage lien against the Property; (b) all aspects with respect to the validity of the sale ... of the Property; and (c) the manner of disposition of any surplus funds after the Property is sold.

tion to Citibank' motion for summary judgment that in his discussions with John Sanderson, a vice-president at Citibank, in mid–1986, Sanderson assured him that Citibank would not move to foreclose.

Nyland (PW)'s waiver defense is based on the doctrine set forth in *Nassau Trust Co. v. Montrose Concrete Products Corp.,* 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E. 2d 1265 (1982). In *Nassau Trust,* the Court of Appeals held that:

> In a foreclosure action based upon nonpayment, the mortgagee's oral waiver of the right to accelerate the principal and foreclose in order to give the delinquent mortgagor a reasonable opportunity to negotiate an unforced sale of the mortgaged premises constitutes a valid affirmative defense to foreclosure . . . .

*Id.* at 178, 451 N.Y.S.2d at 664, 436 N.E.2d at 1266. However, in order to withstand a motion for summary judgment, and thus take advantage of the *Nassau Trust* affirmative defense at trial, the defendant-mortgagor's claim that there was an oral promise to forgo or delay foreclosure "must meet a threshold of believability." *New York State Urban Development Corp. v. Marcus Garvey Brownstone Houses, Inc.,* 98 A.D.2d 767, 771, 469 N.Y. S.2d 789, 795 (2d Dep't 1983). "The bare assertion that certain representatives of the mortgagee made such a promise is not enough to create an issue of fact." *Id.* Thus, "a disputed, uncorroborated affidavit alleging an agreement to forbear foreclosing a defaulted mortgage is inadequate to withstand a motion for summary judgment." *Security Pacific Mortgage & Real Estate Services, Inc. v. Canadian Land Co. of America,* 690 F.Supp. 1214, 1219 (S.D.N.Y.1988) (citing *Marcus Garvey Brownstone Houses, Inc., supra* ). Nyland (PW) argues that Bernstein's affidavit alleges sufficient facts to create a triable *Nassau Trust* issue; moreover, appellant notes that Citibank has not presented an affidavit by Sanderson or anyone else disputing Bernstein's allegations.

Without deciding the question of whether Bernstein's affidavit passed the "threshold of believability," the District Court nevertheless rejected the waiver defense. The Court concluded that even if Citibank had given Nyland additional time before initiating a foreclosure action, there was no possibility that Nyland could have cured its default. As Judge Knapp observed, *Nassau Trust* permits the granting of summary judgment where the moving party can demonstrate that the "giving of notice would 'have been but an idle ceremony, and could not have changed the situation.' " *Nassau Trust Co. v. Montrose Concrete Products Corp.,* 56 N.Y.2d at 186, 451 N.Y. S.2d at 669, 436 N.E.2d at 1271 (quoting *Toplitz v. Bauer,* 161 N.Y. 325, 335, 55 N.E. 1059 (1900)). There was more than ample support in the record for Judge Knapp's conclusion. Judge Leval's March 1986 injunction preventing the transfer or encumbrance of any interest in 40 Wall Street and the other properties involved in the Philippines' suit deprived Nyland of its sole source of funding to cure existing mortgage defaults. An affidavit by Bernstein admits that, after the issuance of the injunction, "Nyland could not secure financing for the ongoing development and administration of 40 Wall Street." Throughout 1986, Nyland negotiated with Citibank to cure its default, but its alternative financing proposal required an additional infusion of funds by Citibank. Once Citibank rejected this proposal, Nyland had nowhere else to turn. Nyland now claims that it should be given the opportunity to formulate additional settlement proposals. However, we agree with Judge Knapp's assessment that any additional forbearance by Citibank would have been an "idle ceremony." Indeed, even on this appeal, Nyland has failed to identify alternative sources of financing upon which it could draw to satisfy the second mortgage, which became due in full on February 1, 1989.

## II. The Faithless Servant Defense

██ Nyland (SF)'s sole claim on appeal is that Nyland should not be held responsible for the mortgage defaults because, it contends, they were caused by New York Land's breach of fiduciary duty as managing agent for 40 Wall Street. This conten-

tion is at odds with the established rule that a principal is liable to third parties for the acts of an agent operating within the scope of his real or apparent authority. *British American & Eastern Co. v. Wirth, Ltd.*, 592 F.2d 75, 80 (2d Cir.1979). Moreover, "a principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority." *See American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566, 102 S.Ct. 1935, 1942, 72 L.Ed.2d 330 (1982).

■ Nyland (SF) does not take issue with this basic rule but notes that a third party who is aware that the agent is acting in his own interest, and not in the principal's interest, assumes the risk of the agent's disloyalty. *See Bertran Packing, Inc. v. Transworld Fabricators, Inc.*, 50 A.D.2d 542, 543, 375 N.Y.S.2d 335, 337 (1st Dep't 1975). Nyland (SF) argues that Citibank knew of the alleged misconduct by Joseph Bernstein acting as president of New York Land and that the bank is therefore not entitled to hold Nyland accountable for Bernstein's illegal acts. They contend that the Court should have permitted them to conduct discovery concerning Citibank's knowledge of misconduct.

Nyland (SF) offers no factual allegations to support its claim that the Bank was aware that New York Land was faithless. Appellant points only to the fact that Citibank was aware that New York Land failed to meet its obligations and had continued to deal with New York Land while complaining that the mortgage was in default. It cannot be that a mortgagee's awareness of defaults under a mortgage constitutes awareness that a managing agent is engaged in self-dealing. Faced with only conclusory allegations and unsupported factual assertions, we reject Nyland (SF)'s "faithless agent" defense.

### III. Removal by the Philippines

■ The Philippines removed this foreclosure action to the Southern District from New York Supreme Court, pursuant to 28 U.S.C. § 1441(d), which provides in relevant part:

Any civil action brought in a State court against a foreign state ... may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending.

Nyland (PW) contends that the Philippines is only a nominal defendant in this case and that its interests are compatible with those of plaintiff Citibank. The Philippines, it is claimed, took no active steps in this litigation and used this case only as a vehicle for collecting funds it is seeking in its own litigation against the Marcoses and their agents. Nyland (PW) requests that this case be remanded to state court.

There is nothing in the text of the statute or in the legislative history to support Nyland (PW)'s contention that the Philippines' interests must be completely adverse to those of the plaintiff in order to remove this case to a federal court of appropriate venue. It is clear that the interests of defendant Philippines and plaintiff Citibank are not entirely compatible. While the Philippines did consent to entry of summary judgment on the issue of foreclosure, it has vigorously contested, both before the District Court and before this Court, Judge Knapp's calculation of sums owing to Citibank. Moreover, the Philippines claims that Citibank's right to these funds is subordinate to those that the Philippines may later establish in proceedings before Judge Leval. The Philippines has adequately demonstrated that its interests are adverse to those of Citibank. We therefore reject appellant's contention that the case should have been remanded to state court.

### IV. Challenges to the Default Interest Rate

■ Nyland (PW) and the Philippines contend that it was error for Judge Knapp to give effect to the provision of Citibank's second mortgage that increased the interest rate on principal to a "default rate" (17.5% for most of the principal) in the event of a default. Appellants contend that Judge Knapp incorrectly relied on *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959), *cert. denied*, 361 U.S. 947, 80 S.Ct.

402, 403, 4 L.Ed.2d 381 (1960), as the controlling authority, rather than *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). In *Ruskin*, this Court ruled that a default interest provision in a financial note is not a penalty and is not unconscionable under New York law. In that case, Ruskin took promissory notes in return for sale of his retail drug store chain. The notes provided for annual interest of four percent but, in the event of default, the rate would rise to six percent. The Court's analysis suggested that variable rates simply reflected the heightened risk of repayment that the creditor bears upon entry of default. Indeed, the Court observed that debtors might fare worse in the future if creditors were not allowed to impose variable rates, because creditors would then impose higher rates for the full life of the loan in order to reallocate the risk. *Ruskin v. Griffiths*, 269 F.2d at 832.

Appellants contend that our case more closely resembles *Vanston*, which this Court distinguished in *Ruskin*. In *Vanston*, the District Court for the Eastern District of Kentucky had appointed an equity receiver for a corporation and suspended payment of its debts. Subsequently, interest became due on a number of the corporation's bonds, but the Court directed the receiver not to pay. The bonds provided for the payment of interest on unpaid interest. The Supreme Court declined to give effect to this "interest on unpaid interest" provision, noting that the provision was directly triggered by the District Court's order suspending payment of the corporation's debts. Thus, the District Court's own action would have led to the enrichment of the bondholders over the subordinate creditors of the insolvent corporation. The Supreme Court concluded that this result would violate equitable principles. *Vanston Bondholders Protective Committee v. Green*, 329 U.S. at 164, 67 S.Ct. at 240.

Nyland (PW) analogizes Judge Leval's injunction preventing encumbrance or transfer of 40 Wall Street to the District Court's order in *Vanston*. However, though these judicial actions are somewhat similar in form, their effects are sufficiently different to distinguish *Vanston* from the pending case. In *Vanston*, the court action precipitated the default. Here, by contrast, Judge Leval's injunction preventing transfer or encumbrance of the property did not bar the debtor from making the mortgage payments; it simply made it more difficult for the debtor to use the property as a basis for securing alternative financing and thereby curing any default that might occur. That circumstance ought not to deny the creditor its normal foreclosure rights.

The Philippines argues that the charging of default interest is a penalty and not a reflection of increased risk, and as such is not enforceable. However, the Philippines does not, and indeed cannot, answer the persuasive argument in *Ruskin* that the increased interest rate reflects the increased risk of non-collection. The fact that the collateral in this case is sufficient does not negate Judge Knapp's observation that Nyland's default "presented an increased risk that the collateral was in less-than-perfect health and that the mortgagee might have to resort to that collateral to obtain payment." The default rate was simply part of Nyland's bargain. Moreover, absent the special circumstances present in *Vanston*, no decision of this Court or of any New York court has impaired the vitality of *Ruskin*. In the absence of any such case, we find *Ruskin* to be controlling and therefore affirm the District Court's order granting payment of default-rate interest.

## V. Real Estate Taxes Advanced by Citibank

■ The Philippines also challenges that part of the District Court's decision allowing Citibank to recover some $6.2 million in real estate taxes advanced by the bank, plus costs, in July 1987, to cure real estate tax defaults on the property. This claim would be frivolous were it not for the fact that Citibank engaged in an unusual series of financial maneuvers before advancing the funds. It is conceded that Nyland had failed to pay the taxes on the building since

July, 1986. The City threatened to commence an *in rem* foreclosure action, and the ground-lessor threatened to terminate its lease. Fearing that the second mortgage was in jeopardy, Citibank decided to advance the taxes. Under the provisions of the second mortgage, Citibank is entitled to reimbursement for monies advanced to cure tax defaults, plus interest on that advance. However, at the time of the tax default, Nyland was challenging the validity of the second mortgage in this action. Rather than risk an advance of $6.2 million solely under a mortgage subject to legal challenge, Citibank purchased the first mortgage on 40 Wall Street from the New York State Teachers Retirement Authority. The first mortgage, which has not been declared in default by Citibank, contains a reimbursement provision similar to the one in the second mortgage. After purchasing the first mortgage, Citibank advanced the $6.2 million.

The Philippines argues that, as a result of these maneuvers, Citibank must be deemed to have advanced the taxes "under" the first mortgage only and that the $6.2 million has become part of that indebtedness alone. This argument is bolstered by the fact that Citibank advised the District Court that it was advancing the tax money under the first mortgage, and the bank acknowledges that the sum is now an added obligation of the first mortgage loan. Having elected to advance under the first mortgage, the Philippines contends, Citibank should be limited to recouping its advance under the periodic payments of the first mortgage. The financial incentive motivating the Philippines's argument is clear: If the mortgagee's tax advances are part of the first mortgage only, then Citibank could not be reimbursed for them out of the monies collected from the forced sale of the property, since only the second mortgage is being foreclosed. Thus, an additional $6.2 million would flow from the sale into Judge Leval's court, rather than into Citibank's coffers.

Citibank responds that it purchased the first mortgage in order to have an *additional* source both of authorization to advance the taxes and security to recoup them. It thus claims to have advanced the taxes "under" both the first and second mortgages. This would appear to contradict some statements made by the mortgagee to the District Court regarding the status of the advances. Nevertheless, Judge Knapp agreed with Citibank. The Court noted that Citibank's advance conferred a benefit on all the defendants, especially the Philippines, because it fended off an *in rem* foreclosure action by New York City. Judge Knapp concluded that it would be inequitable for Citibank, having conferred this benefit, to be relegated to waiting for the periodic payments of the first mortgage. He therefore held that Citibank was entitled to recoup the $6.2 million from the proceeds of the sale upon foreclosure of the second mortgage. In addition, so as to account for the full current value of the advance, the Court determined that Citibank was entitled to recover, as "expenses of enforcement" under section 2.14 of the second mortgage, a loss measured by the difference between the first mortgage rate of 6.5%, which is being applied to the tax advances, and Citibank's cost of funds for the advance over the post-advance period. Citibank suggested this interest rate formula, rather than seek to have the second mortgage's interest rate apply to the tax advance. The second mortgage rate is higher than current rates and thus would have siphoned off more funds from the proceeds of the forced sale than will result from use of the current-cost-of-money-less-first-mortgage-rate approach.

We do not doubt Citibank's basic point that a loan may be secured by more than one mortgage. It is also clear that, under New York law, taxes advanced by the mortgagee for the defaulting mortgagor become a lien on the property secured by the mortgage. N.Y.Real Prop. Law § 254(6) (McKinney 1989); *see also Marine Midland Bank, N.A. v. Harrigan Enterprises, Inc.*, 118 A.D.2d 1035, 500 N.Y.S.2d 408 (3d Dep't 1986). We have some reservations about Citibank's claim that it advanced the taxes under both its mortgages, particularly in light of its statements to the District Court that it was advancing the

**627**

taxes under the first mortgage. However, we have found no New York statute or case that precludes the holder of more than one mortgage on a property from electing to recoup its tax advances from the proceeds of the foreclosure of whichever mortgage is in default, nor does New York appear to prescribe any formalities such a mortgagee must observe, when making the advance, to maintain recoupment options under all its mortgages. In the absence of any indication in New York law that the District Judge's solution is invalid, we affirm his determination with respect to the tax advances.

### VI. Subordination of Citibank's Claim

The Philippines also claims that Citibank's right to default interest and late charges should be subordinated to the Philippines' pending claim to a constructive trust in the equity in the mortgaged property. We agree with Judge Knapp that the Philippines' claim to the property is not an issue in the case before him but is a matter that remains to be adjudicated in the case before Judge Leval. As Judge Knapp suggested, however, the Court's order of foreclosure and its order disbursing funds to Citibank does not preclude the Philippines from seeking to recover those funds from Citibank, at such time as it may establish, in Judge Leval's court, an entitlement to the funds. If and when the Philippines establishes this entitlement, it can easily make Citibank a party-defendant to that litigation. Citibank is not about to flee the jurisdiction or secrete its assets to avoid an adverse money judgment in the Southern District of New York. We also note that by the terms of its settlement with Citibank in this case, the Philippines retains the right for two years after the conclusion of this action to raise any claim against Citibank that it could have asserted in this foreclosure action. Thus, our affirmance of the District Court's judgment is without prejudice to any claims the Philippines may later establish to the proceeds from the sale of 40 Wall Street.

### Conclusion

We have considered appellants' remaining claims and find them lacking sufficient merit to warrant discussion. The judgment of the District Court is in all respects affirmed.