ASIA NORTH AMERICA EASTBOUND
RATE AGREEMENT, Plaintiff,

v.

PACIFIC CHAMPION SERVICE
CORP., Defendant.

Civ. A. No. 93–1365.

United States District Court,
District of Columbia.

Sept. 23, 1994.

nonprofit basis for the members of the group in order to secure volume rates or "service contracts."[1]

Torbjorn B. Sjogren, Anne E. Mickey, Sher & Blackwell, Washington, DC, for plaintiff.

Nicholas H. Cobbs, Washington, DC, for defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on defendant's motion for summary judgment or, in the alternative, to transfer venue to the Central District of California, and plaintiff's cross-motion for summary judgment or, in the alternative to transfer venue to the Southern District of New York. Although "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56," for the benefit of the parties in this and several related cases, the Court nonetheless sets forth its analysis. Fed. R.Civ.P. 52(a).

### Background

In this admiralty action, plaintiff Asia North America Eastbound Rate Agreement ("ANERA") seeks to collect liquidated damages from defendant Pacific Champion Service Corporation ("Pacific Champion") for a shortfall in the quantity of goods that were to be shipped for the period May 30, 1987, to May 29, 1988. ANERA is a conference of ocean common carriers based in Hong Kong and formed pursuant to the Shipping Act of 1984, 46 U.S.C. app. §§ 1701 *et seq.* ("the Act"). Pacific Champion is a non-vessel-operating common carrier and a member of the International Shippers Association, Inc. ("ISAI"), an association that, pursuant to the Act, consolidates or distributes freight on a

In early April 1987, Pacific Champion signed a Participation Agreement ("PA") with ISAI. It was one of eight ISAI members who executed such agreements with ISAI. Paragraph 2(a) of the Participation Agreement entitled "Authorization to Negotiate Service Contract" stated:

> The Member [Pacific Champion] authorizes the Association [ISAI] to negotiate and execute a service contract with the Asia North America Eastbound Rate Agreement ("ANERA") on its behalf for the transportation of the Member's products as indicated herein, under such terms and conditions as are negotiated by the Association's Board of Directors. Any service contract entered into by the Association with ANERA shall be binding upon the Member.

Pacific Champion's individual minimum volume commitment was set at 100 forty-foot equivalent container units ("FEUs"), which Pacific Champion appears to have fulfilled. Martin Kuo Affidavit ¶¶ 7, 8. The Participation Agreement further provided that if ISAI failed to meet the total minimum cargo commitment in its service contract with ANERA, then ISAI would be liable to ANERA for liquidated damages for the shortfall; however, ISAI would have the right to collect a "proportionate share" of the liquidated damages from each of its members, "a percentage determined by dividing the Member's individual Minimum Volume Commitment by the Association's total minimum cargo commitment under the service contract."[2] PA ¶ 3(b). The Participation Agreement further provided that Pacific Champion agreed to the assignment of this right to ANERA under the terms of the service contract.

---

1. "Service contract" is defined in the Act as "a contract between a shipper and an ocean common carrier or conference in which the shipper makes a commitment to provide a certain minimum quantity of cargo over a fixed time period, and the ocean common carrier or conference commits to a certain rate or rate schedule as well as a defined service level ...; the contract may also specify provisions in the event of nonperfor-

mance on the part of either party." 46 U.S.C. app. § 1702(21).

2. The Participation Agreement provided that members could determine a method for funding the liquidated damages liability; however, because this was not done here, the "proportionate share" provision determines the method of funding liquidated damages.

On May 28, 1987, ANERA and ISAI entered into such a service contract, SC No. 656/87 ("the Service Contract"), on behalf of the eight participating members, including Pacific Champion. Under the Service Contract, ISAI agreed to ship and ANERA agreed to carry a minimum of 1,000 FEUs of mixed commodities from ports in the Far East to several ports or points in the United States during the period from May 30, 1987, to May 29, 1988. ISAI agreed to pay a deficit charge—deadfreight liability—of $1,435 per FEU if it did not meet 85% of its minimum quantity commitment of 1,000 FEUs.

On May 29, 1988, when the Service Contract expired, ISAI had shipped only 307.75 FEUs, thus failing to meet 85% of its minimum quantity commitment. In October of 1989, ISAI was notified that it owed ANERA $993,378.75 in deadfreight liability.[3] Counsel for ANERA notified ISAI that ISAI was liable for this amount by certified mail or Federal Express again on May 10, 1990, July 26, 1990, and August 13, 1990, and that ANERA would proceed to arbitration, as provided for in paragraph 17(a) of the Service Contract, if the liability was not satisfied. On November 12, 1991, ANERA demanded arbitration, and on April 10, 1992, Michael Terazawa, the president of ISAI, informed counsel for ANERA that ISAI had received the demand. Despite notices from the arbitrator by certified mail on June 11, 1992, July 12, 1992, August 15, 1992, and September 18, 1992, ISAI did not appear. On October 31, 1992, the arbitrator awarded ANERA $1,251,346.10, which ISAI did not pay. On January 11, 1993, ANERA notified ISAI that

ISAI's right to collect a proportionate share of the liquidated damages from Pacific Champion had been automatically assigned and transferred to ANERA. On the same date, ANERA notified Pacific Champion of the arbitral award and demanded that Pacific Champion pay its proportionate share, 10% of the award.[4] On January 22, 1993, ANERA filed a petition to confirm the arbitral award against ISAI in this district. On March 31, 1993, a default judgment in the amount of $1,295,348.81 was entered against ISAI.[5] ANERA now seeks to collect Pacific Champion's proportionate share of the liquidated damages.

### Analysis

#### 1. Venue

As a preliminary matter, the Court must determine whether venue properly lies in this district. Because the Court's jurisdiction in this action is based on admiralty jurisdiction under 28 U.S.C. § 1333, the statutory venue provisions under 28 U.S.C. § 1391 are inapplicable. Fed.R.Civ.P. 82. "Instead, the general admiralty practice prevails in which venue and personal jurisdiction analyses merge." *In Re McDonnell–Douglas Corp.*, 647 F.2d 515, 516 (5th Cir.1981); *see Sunbelt Corp. v. Noble, Denton & Assocs., Inc.*, 5 F.3d 28, 31 n. 5 (3d Cir.1993). Venue is proper in any district court which can obtain personal jurisdiction over the defendant. *Sunbelt Corp.*, 5 F.3d at 31 n. 5. Thus, defendant's written consent in the Participation Agreement to personal jurisdiction

---

**3.** The deadfreight liability was calculated as follows:

| | |
|---|---|
| Minimum Quantity Commitment: | 1000.00 FEUs |
| — Quantity Shipped: | 307.75 FEUs |
| = Deadfreight | 692.25 FEUs. |

At a rate of $1,435 per FEU—$1,435 × 692.25—the total deadfreight liability equals $993,378.75.

**4.** Pacific Champion's proportionate share is calculated as follows:

$$\frac{\textit{Individual Minimum Volume Commitment:} \quad 100 \text{ FEUs}}{\text{ISAI's Total Minimum Cargo Commitment:} \quad 1000 \text{ FEUs}} = 10\%.$$

**5.** This amount consists of $993,378.75 for deadfreight liability (*supra* note 3), $249,620.32 for interest thereon, $4,224.50 for attorneys' fees, $4,122.53 for the arbitrator's fee, and $44,002.81 for interest on the arbitration award for the period October 31, 1992, to March 31, 1993.

in this district establishes venue here as well.[6] *Id.*

■ Unlike mandatory and exclusive forum selection clauses, which are enforced in admiralty absent bad faith, fraud, or fundamental unfairness, and preclude transfer to another district, *see Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 595, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991), the instant forum selection clause is a permissive and nonexclusive clause. Therefore, although venue is proper in this district, the Court still must determine whether this action should be transferred to another district, as defendant argues, pursuant to 28 U.S.C. § 1404(a). *In Re McDonnell–Douglas Corp.,* 647 F.2d at 516–17 (noting that "[a]lthough the other general venue statutes are inapplicable in admiralty, section 1404(a) has been held to apply.").

■ Section 1404(a) provides that: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Defendant contends that these factors weigh in favor of transferring this action to the Central District of California. The Court disagrees. First, a plaintiff's choice of forum is entitled to substantial deference. *E.g., International Bhd. of Painters & Allied Trades Union v. Best Painting & Sandblasting Co.,* 621 F.Supp. 906, 907 (D.D.C.1985). Common sense dictates that this choice of forum should not be upset where the parties have

agreed *ex ante* to resolution of disputes in that forum. Moreover, a permissive forum selection clause should be given strong consideration in the admiralty context because the disputes involved are international rather than local in nature and forum selection clauses serve special purposes for disputes involving international concerns.[7] *Cf. Carnival Cruise Lines, Inc.,* 499 U.S. at 590–94, 111 S.Ct. at 1526–28 (giving dispositive effect to an exclusive forum selection clause in the admiralty context); *Stewart Org. Inc. v. Ricoh Corp.,* 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (discussing how a forum selection clause is to be weighed by a federal court sitting in a diversity case, in contrast to admiralty). Upon consideration of the entire record, the Court finds that these factors outweigh any inconvenience to Pacific Champion. *See also American President Lines, Ltd. v. Kirch Indus. Co., Ltd.,* No. 93–497 (CRR), at 6 (D.D.C. filed Dec. 7, 1993) (denying motion to transfer venue because respondent consented to jurisdiction and venue). Accordingly, the motion to transfer venue is denied.

## 2. *Validity of the Contract*

■ ANERA moves for summary judgment on the ground that the terms of the Participation Agreement and the Service Contract unambiguously establish Pacific Champion's liability. Pacific Champion moves for summary judgment on the grounds that the action is barred by the defense of laches or that the judgment against ISAI is invalid and therefore may not

---

**6.** The Participation Agreement states: "The Member [Pacific Champion] ... consents to the jurisdiction of and the enforcement of said rights in the Courts of the State of New York and/or in the District of Columbia." *See* Participation Agreement ¶ 3(c).

**7.** The Supreme Court's observations about the purposes served by forum selection clauses in the cruise ship industry are applicable to the shipping industry generally. Like a cruise line, ANERA "has a special interest in limiting the fora in which it potentially could be subject to suit" because it also is involved in a business that traverses many jurisdictions. *Carnival Cruise Lines, Inc.,* 499 U.S. at 592, 111 S.Ct. at 1527. "Additionally, a clause establishing *ex ante* the forum for dispute resolution has the salutary effect of dispelling any confusion about where

suits arising from the contract must be brought, sparing litigants the time and expense of pretrial motions to determine the correct forum...." *Id.* Finally, like the passengers who benefit from forum selection clauses in the form of reduced fares reflecting the savings the cruise line enjoys by limiting the fora for dispute resolution, a common carrier like Pacific Champion enjoys reduced shipping rates which may be facilitated by limiting the fora for dispute resolution. *Id.*

The Court notes that ANERA is involved in litigation with several different common carriers and shippers' associations in this district. The "interests of justice" do not favor forcing an international conference of ocean common carriers like ANERA to litigate its claims against them in a multitude of jurisdictions when the parties have consented to suit in this district.

be enforced against Pacific Champion. Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ The Participation Agreement and the Service Contract provide that New York law shall govern the contract. "Under American law, contractual choice-of-law provisions are usually honored," even when it is part of a form contract and is not the subject of bargaining. *See Milanovich v. Costa Crociere, S.P.A.*, 954 F.2d 763, 767 (D.C.Cir.1992). Accordingly, the Court applies New York law in resolving this dispute.

■ "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" because the terms of the contract express the intent of the parties. *Austin v. Canbar Assoc., Inc.*, 175 A.D.2d 195, 572 N.Y.S.2d 339, 340 (N.Y.App.Div. 1991). Accordingly, "where the intention of the parties is expressed in plain and unambiguous terms, the question is one of law which may be decided on motion for summary judgment."[8] *Id.; see American Express Bank, Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (1990),

*appeal denied,* 77 N.Y.2d 807, 569 N.Y.S.2d 611, 572 N.E.2d 52 (1991).

■ The Participation Agreement and the Service Contract, to which Pacific Champion agreed to be bound, are unambiguous as to Pacific Champion's liability. The Participation Agreement expressly states that "[i]n the event the Association fails to meet its minimum cargo commitment under the ANERA service contract, it may become liable to ANERA for liquidated damages for the shortfall." PA ¶ 3(a). As discussed *supra,* the Participation Agreement stated that ISAI would be entitled to collect this amount from all members by assessing each member's "proportionate share"—"a percentage determined by dividing the Member's individual Minimum Volume Commitment by the Association's total minimum cargo commitment under the service contract," 10%.[9] *Id.* ¶ 3(b). The Participation Agreement further stated that "[t]he Member agrees to the assignment to ANERA of all rights to ... collect the Member's share of unpaid liquidated damages under the terms set forth in the service contract with ANERA." *Id.* ¶ 3(c).

Paragraph 9 of the Service Contract, although not using the precise term "liquidated damages," is the sole provision in the Service Contract dealing with damages, and unambiguously provides for the assessment of liquidated damages against ISAI in the event of a shortfall in ISAI's minimum quantity commitment:

*[I]n lieu of all damages, which are difficult to calculate, dead freight shall be assessed as follows:*

---

8. Martin Kuo, the president and general manager of Pacific Champion, states that he did not read the Participation Agreement or the Service Contract before signing the Participation Agreement, and did not understand the scope of Pacific Champion's potential liability. Martin Kuo Affidavit ¶ 6 (filed Oct. 20, 1993). Kuo's failure to read the entire contract and his erroneous subjective understanding about the terms of the contract do not relieve Pacific Champion of its contractual obligations. *See Barone v. M & K Realty*, 143 A.D.2d 1008, 533 N.Y.S.2d 611, 612 (1988); *Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co.*, 775 F.Supp. 606, 613 (S.D.N.Y.) ("It is axiomatic that the signer of a contract is presumed to have read and understood all he signs

regardless of whether he actually examined the document"), *aff'd,* 961 F.2d 387 (2d Cir.1991).

Kuo also states that the signature page of the Participation Agreement he received from ANERA's counsel in 1993 (attached as exhibit 1 to the complaint) differs slightly from the signature page of the Participation Agreement he received and signed in April 1987. He does not deny, however, that his signature is genuine, nor does he allege that the Participation Agreement was altered after he signed it. Kuo Affidavit ¶ 11.

9. *See supra* note 4 for the calculation of Pacific Champion's proportionate share.

(i) If the Shipper [ISAI] fails to tender the *Minimum Quantity Commitment* specified in Appendix A of this Contract, the Agreement [ANERA] shall invoice the Shipper and the Shipper agrees to pay the deficit charges according to the following formula:

(A) If the Shipper fails to tender at least 85% of the Minimum Quantity Commitment ... the Shipper agrees to pay deficit charges at the lowest of 40'/20'/RT rate, specified in Appendix A ($1,435).

Service Contract ¶ 9(b) (emphasis added). These provisions, read together, plainly and unambiguously establish that ISAI was liable to ANERA for $1,435 per FEU shortfall, plus attorneys' fees, costs, and interest (as provided in paragraph 9(b)(iii)), totalling $1,295,348.81, and that Pacific Champion, as a participating member of ISAI, is liable for 10% thereof, $129,534.88. Neither the Service Contract nor the Participation Agreement excuses members like Pacific Champion who may have fulfilled all or part of their individual minimum volume commitments from paying their proportionate share of liquidated damages.

Pacific Champion contends that the Participation Agreement should not be enforced on the grounds that: (1) ISAI may have procured Pacific Champion's contractual commitment by fraud; (2) the Participation Agreement and the Service Contract are unconscionable; (3) ANERA waived its liquidated damages claim against Pacific Champion; and (4) ANERA failed to mitigate its damages. The Court addresses each of these briefly.

■■ First, assuming *arguendo* that ISAI may have procured Pacific Champion's contractual commitment by fraud,[10] because ISAI had both actual and apparent authority to act as Pacific Champion's agent in arranging for ocean transportation under a service contract, *see* PA ¶ 2(a), and ISAI acted within the scope of this authority in negotiating and executing the Service Contract, Pacific Champion, as the principal, would be liable for ISAI's fraud. *See, e.g., Citibank, N.A. v. Nyland (CF8) Ltd.,* 878 F.2d 620, 624 (2d Cir.1989).

■■■ Next, Pacific Champion contends that the contract should not be enforced because it is unconscionable. "To be found unconscionable, a contract must be so grossly unreasonable in light of the mores and business practices of the time and place as to be unenforceable." *Fallon v. Berney,* 189 A.D.2d 1028, 592 N.Y.S.2d 860, 862 (1993). Both procedural and substantive aspects of the contract are considered. *Id.* Neither paragraph 9(a)(ii) of the Service Contract, which established ISAI's exclusive remedy in the event ANERA breached its service commitment, nor the liquidated damages provision of the Participation Agreement meet this standard.[11]

■■ Third, Pacific Champion contends that when ANERA chose to pursue its claim against ISAI in arbitration and in federal court, and did not give notice thereof to Pacific Champion, ANERA somehow waived its claim against Pacific Champion. The Participation Agreement states, however, that: "[t]he Member agrees to the assignment to ANERA of all rights to ... collect the Member's share of unpaid liquidated damages un-

---

**10.** Although Pacific Champion alleges that ISAI procured the contractual commitment of another ISAI member, Carrand Companies, by fraud, Pacific Champion does not allege that ISAI procured Pacific Champion's commitment by fraud.

**11.** The statements of the Federal Maritime Commission ("FMC") do not belie this conclusion. *See* Circular Letter No. 1–89, 54 Fed.Reg. 15256 (1989) (discussing FMC standards for evaluating whether service contracts meet federal statutory requirements); *Western Overseas Trade & Dev't Corp. v. ANERA,* 26 Shipping Reg. (P & F) 874, 884 (FMC Apr. 26, 1993) (same). Rather, the FMC considered whether the level of service commitments were adequate under the Shipping

Act. The adequacy of service commitments is significant because "[m]eaningful minimum quantities of cargo over a fixed time period and rate and defined service level commitments between a carrier and a shipper are the legislative *quid pro quo* for departing from the published tariff rates of the carrier that would otherwise apply. The failure of the contract parties to fulfill the basic requirements of this *quid pro quo* not only offends the legislative scheme crafted by Congress, but also could ... make the service contract but a device to evade the carrier's tariff rates in violation of section 10(a)(1) of the Act." 54 Fed.Reg. 15256 (1989).

der the terms set forth in the service contract with ANERA." PA ¶ 3(b). The Service Contract obligated ANERA to proceed first by way of arbitration with ISAI on its claim against ISAI for failure to pay the liquidated damages. Service Contract ¶ 17. It did not obligate ANERA to notify Pacific Champion of the arbitration proceeding or the petition to confirm the arbitral award.[12] Because ANERA proceeded in accordance with the Participation Agreement and the Service Contract, it did not waive its claim against Pacific Champion.

▮▮▮▮ Finally, Pacific Champion contends that summary judgment is inappropriate on the ground that issues of fact exist as to whether ANERA failed to mitigate its damages. Although it is well-settled that, as a general rule, a party may not recover damages for loss that he could have avoided by reasonable efforts, defendant bears the burden of coming forward with evidence, and ultimately proving, that the loss in fact could have been prevented by reasonable efforts. *See Cornell v. T.V. Dev't Corp.*, 17 N.Y.2d 69, 268 N.Y.S.2d 29, 33, 215 N.E.2d 349 (1966); *Oneonta Dress Co. v. Ozona–USA, Inc.*, 120 A.D.2d 899, 503 N.Y.S.2d 167, 169 (1986). Pacific Champion has failed to come forward with any evidence that ANERA could have prevented its damages. First, ISAI's failure to comply with the monthly reporting requirements on the quantity of cargo shipped would not have entitled ANERA to repudiate its Service Contract with ISAI, as Pacific Champion suggests. *See* 46 U.S.C. §§ 1707(c), 1709(b). Assuming *arguendo* that it would have, there is no showing that repudiation of the Service Contract would have reduced the deadfreight liability. Second, the timing of ANERA's claim against ISAI did not affect the amount of deadfreight liability because, once the shortfall was accrued at the end of the Service Contract period, the amount of each member's proportionate share of liability was fixed.

### 3. *Laches*

▮▮▮▮ Pacific Champion contends that this suit should be barred based on the equitable doctrine of laches. In actions in admiralty, the doctrine of laches, rather than a statute of limitations, determines whether a suit is barred by the lapse of time. *DeSilvio v. Prudential Lines, Inc.*, 701 F.2d 13, 15 (2d Cir.1983); *Larios v. Victory Carriers, Inc.*, 316 F.2d 63, 65 (2d Cir.1963). The factors to be considered are: (1) whether the limitations period established by an analogous statute of limitations has expired; (2) the reasonableness of the plaintiff's delay in bringing suit; and (3) the prejudice to the defendant resulting from the delay. *See DeSilvio*, 701 F.2d at 15; *Puerto Rico Marine Management, Inc. v. El Verde Poultry Farms*, 590 F.Supp. 1174, 1176 (D.P.R.1984). Here, the analogous limitations period is the statute of limitations for breach of contract under New York law, which is six years. N.Y.Civ. Prac.L. & R. § 213 (McKinney 1993). Assuming without deciding that ANERA's cause of action against Pacific Champion accrued on May 29, 1988 (the expiration date of the Service Contract), this action, filed on June 30, 1993, was filed within the analogous limitations period. Because this action was brought within the limitations period, the presumption is that the suit should be allowed to proceed. *Larios*, 316 F.2d at 66. The other two factors, the reasonableness of the delay in bringing suit and resulting prejudice to the defendant, also weigh in favor of permitting this action to proceed. Far from sitting on its rights, within approximately 16 months of the expiration of the Service Contract ANERA actively pursued its claim against ISAI through arbitration and in federal court, in accordance with the procedures set forth in the Service Contract. Within three months of obtaining a default judgment against ISAI ANERA filed this action against Pacific Champion. The minimal prejudice that Pacific Champion claims to

---

**12.** Because Pacific Champion was not entitled to participate in the arbitration proceeding against ISAI or the subsequent petition to confirm the arbitration award, the sufficiency of service of process on ISAI in *ANERA v. ISAI*, No. 93–145 (RCL) (D.D.C. judgment entered April 1, 1993), is irrelevant to Pacific Champion's liability. Pacific Champion's liability arises out of its consent to the assignment to ANERA of ISAI's right to collect Pacific Champion's proportionate share of liquidated damages. PA ¶ 3(c). In any event, the Court agrees with the finding in *ANERA v. ISAI* that service of process on ISAI was adequate.

have suffered—mainly, diminished ability to obtain evidence and seek recovery from ISAI (now defunct) and from other ISAI members—does not outweigh the other two factors. Therefore, the Court finds that the doctrine of laches is not a defense to this action. *Cf. Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 843–45 (D.C.Cir. 1982) (rejecting laches defense where the delay in filing suit resulted from exhausting administrative remedies and the loss of evidence was ameliorated by availability of other documentation).

### *Conclusion*

For the foregoing reasons, plaintiff's motion for summary judgment is granted, and defendant's motion for summary judgment or, in the alternative, to transfer venue, is denied. An appropriate Order accompanies this Opinion.

### *ORDER*

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that plaintiff's motion for summary judgment is granted, and that judgment is entered for plaintiff in the amount of $129,534.88. It hereby further is

ORDERED, that defendant's motion for summary judgment or, in the alternative, to transfer venue is denied.

SO ORDERED.